**STATE of Maine**

**v.**

**David S. SKLAR.**

Supreme Judicial Court of Maine.

March 21, 1974.

Foahd J. Saliem, Asst. Atty. Gen., Augusta, for plaintiff.

Eames & Eames, by Richard S. Sterns, Skowhegan, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

WERNICK, Justice.

Pursuant to Rule 37A(b) M.R.Crim.P., this case has been reported by a Justice of the Superior Court for our decision of an

important question of law thought to be involved in the Justice's interlocutory order that

> "it appearing . . . that the offense of which the Defendant is charged is a petty offense and that he has no constitutional right to trial by jury, it is hereby ordered he be remanded to the Twelfth District Court, Division of Somerset, for trial without jury."

The case had originated in the District Court on a complaint (dated October 10, 1973) charging defendant with having violated 29 M.R.S.A. § 1251 (as amended) in that, on October 2, 1973, he had operated a motor vehicle in the Town of Skowhegan at a speed (allegedly 65 mph) in excess of the speed limit established and posted by law (45 mph).[1]

On October 10, 1973, defendant, purporting to act under 15 M.R.S.A. § 2114 (as amended effective October 3, 1973; P.L. 1973, Chapter 520),[2] declined

> "in open court [to] waive in writing his right to a jury trial . . . and elect

to be tried in the District Court at a hearing before the Judge of the District Court on a plea of not guilty . . .."

The District Court Judge thereupon forthwith transferred the case to the Superior Court "for arraignment and disposition." The Superior Court's order of remand (as above described) followed on October 19, 1973. The effectiveness of the order was stayed pending decision by this Court.

The Justice of the Superior Court and the parties seek to achieve by the instant Report a decision by this Court whether Article I, Section 6 of the Constitution of Maine[3] guarantees a right of trial by jury to one accused of speeding, a violation punishable

> "by a fine of not less than $10 nor more than $100, or by imprisonment for not more than 90 days, or by both"

and deemed, therefore, by the Justice of the Superior Court to be a "petty", rather than "serious", contravention of the criminal law.

1. 29 M.R.S.A. § 1251 (as amended) authorizes governmental regulation of speed by the following pertinent language:
   "It shall be unlawful to drive in excess of such speeds as may be fixed pursuant to this section provided that notice of such changes in speed shall be given by signs which shall be erected by the State Highway Commission and which appear on the highway."
   The penalty for a violation of Section 1251 is supplied by 29 M.R.S.A. § 2303:
   "Whoever violates or fails to comply with any provision of this Title, or any rules or regulations established thereunder, when no other penalty is specifically provided, shall be punished by a fine of not less than $10 nor more than $100, or by imprisonment for not more than 90 days, or by both."

2. 15 M.R.S.A. § 2114 (as amended 1973) reads:
   "In all prosecutions before the District Court, the defendant may in open court waive in writing his right to a jury trial in the Superior Court and elect to be tried in the District Court at a hearing before the Judge of the District Court on a plea of not guilty or enter a plea of guilty or nolo contendere. If the Judge of the Dis-

trict Court is satisfied that the defendant's waiver of his right to jury trial is made freely and understandingly, he may then proceed to dispose of the case. The Judge of the District Court may refuse to accept the defendant's waiver of his right to jury trial or the defendant may refuse to waive the same or decline to make an election, in which event the Judge of the District Court shall forthwith transfer the case to the Superior Court for arraignment and disposition. Any appeal to the Superior Court following an accepted waiver and judgment of conviction in the District Court shall be on questions of law and on the sentence only. Nothing in this section shall prevent a defendant, after the transfer of the case to the Superior Court, from waiving his right to jury trial in the Superior Court, in which event the case shall be heard by a Justice of the Superior Court without jury."

3. Article I, Section 6 of the Maine Constitution reads in pertinent part:
   "In all criminal prosecutions, the accused shall have a right . . . [t]o have a speedy, public and impartial trial, and, except in trials by martial law or impeachment, by a jury of the vicinity."

## I.

At oral argument, a preliminary problem arose whether the constitutional issue must be decided in the instant case.

The theory is that, arguably, the order of remand to the District Court can be shown erroneous on a ground other than defendant's asserted constitutional right to trial by jury; hence, this Court must, in any event, order the case to remain in the Superior Court for further proceedings. Since on the present record, the theory continues, it fails to appear that defendant had made a demand for jury trial in the Superior Court, he does not yet stand deprived in that Court of a right to jury trial, if any; and if in the further proceedings in the Superior Court defendant sees fit to waive his right to jury trial, if any, the constitutional issue will have disappeared. Thus, were this Court now to decide the question of defendant's constitutional right to trial by jury, the Court would be acting unnecessarily and prematurely.

Analysis discloses, however, that the foregoing line of reasoning is deficient and the issue of defendant's constitutional right to jury trial is here squarely presented and must be decided.

It is incorrect that an adequate ground independent of a determination of the constitutional issue may be found upon which the Superior Court's order of remand will be held erroneous.

The argument to establish such independent ground runs as follows. By its textual language 15 M.R.S.A. § 2114 plainly applies *only* to those criminal prosecutions in the District Court in which a right to trial by jury avowedly exists. Thus, whether inadvertently or otherwise, the Legislature has failed by virtue of 15 M.R.S.A. § 2114 to require as to any criminal prosecution in the District Court in which defendant *lacks* right to trial by jury that the case be fully heard and sentence imposed *only* by the District Court—with ac-cess to the Superior Court confined to an "appeal" on "questions of law and . . . sentence only" (as provided in 15 M.R.S.A. § 2114). This being so, to plug the potential gap which arises if there can be prosecutions in the District Court in which defendant will be without a right to trial by jury, 15 M.R.S.A. § 2111, dealing in general terms with "appeals" from the District Court to the Superior Court, must be brought into play; and it must be considered to preserve in those prosecutions, if any, in which defendant *lacks* right to jury trial the practice by which, upon waiver of reading and hearing and plea of not guilty, defendant may "appeal" to the Superior Court for a full hearing in the Superior Court in which the Justice of the Superior Court would act without a jury. Thus, this argument proceeds, if the instant prosecution be hypothesized, arguendo, as a prosecution in which defendant is without a right of jury trial, the obligation of the Justice of the Superior Court is to treat the purported "transfer" as if it be an appeal" under 15 M.R.S.A. § 2111; and the Superior Court Justice should give defendant a full de novo hearing in the Superior Court, the Justice acting as the "court" without a jury.

The infirmity of the approach is its facilely indulged premise that whenever a "transfer" of a prosecution from the District Court eventuates as incorrect, the "transfer" becomes automatically transformed into an "appeal" under 15 M.R.S.A. § 2111. That section, it must be emphasized, requires that the "appeal" be taken by an "aggrieved defendant" who has had a District Court "judgment . . . rendered against him." When a prosecution is "transferred" under 15 M.R.S.A. § 2114 there will not have been any plea in the District Court by the defendant or a judgment rendered by the District Court against the defendant. The "transfer" is to the Superior Court "for arraignment and disposition" in the Superior Court. Thus, if in the present situation the "transfer" is hypothesized, arguendo, as incorrect, 15 M.

R.S.A. § 2111 would not have applicability to authorize the Superior Court to hold the case as an "appeal . . . from a judgment of the District Court." The case would be in the Superior Court improperly, and the only appropriate action by that Court would be a remand to the District Court for further proceedings in the District Court to yield the judgment necessary before the Superior Court could consider the matter properly "appealed" to the Superior Court under 15 M.R.S.A. § 2111.

The purported warning that this Court avoid decision of the constitutional issue is erroneous in a second respect. It will be recalled that it rested on the further premise that the present record fails to disclose a demand by defendant in the Superior Court for a trial by jury without which defendant cannot be said to have yet been deprived by the Superior Court of a right to a trial by jury.

■ This constitutes a misconception of the proper legal effect to be attributed to such "silence" of the present record. Under 15 M.R.S.A. § 2114, as implemented by Rules 23 and 40, Maine District Court Criminal Rules (effective October 3, 1973 and applicable to the instant prosecution commenced in the District Court after October 3, 1973), it is clear that defendant is legally deemed to be demanding jury trial unless and until by *affirmative action in writing* he waives it. Defendant continues in this legal stance, as a person automatically demanding his right to jury trial, when he appears before the Superior Court by virtue of the District Court's "transfer" of his case to the Superior Court until, "with the approval of the Court", he waives his right to jury trial "in writing"— as shown by Rule 23 M.R.Crim.P.

In the present instance, then, a "silent" record establishes that defendant was affirmatively making a demand for jury trial in the Superior Court. Recognizing this legal posture of the defendant, the Justice presiding in the Superior Court immediately and explicitly (1) responded by denying that defendant had a right to jury trial insofar as "the offense of which the Defendant is charged is a petty offense" and (2) implemented the denial by ordering the case remanded to the District Court (where no trial by jury may be had).

■ We must, therefore, reject the thought that defendant was nonetheless obliged to place on record a demand for jury trial, as affirmatively stated in the Superior Court, if he wished to preserve the issue of his constitutional right to jury trial for decision by this Court. This would be to require defendant to perform an obviously unnecessary, empty and futile act, the presiding Justice having already made explicitly plain that defendant had no right to a trial by jury and would be afforded no such trial (nor any trial) in the Superior Court.

On the present record, defendant is in the legal position of a person demanding trial by jury and deprived of it. The correctness or error, of the ruling of the presiding Justice in denying to defendant a trial by jury in the Superior Court, the denial being reinforced by a remand of the case to the District Court for trial without jury, thus posits squarely for this Court's decision the issue of the scope of the jury trial guarantee of Article I, Section 6 of the Constitution of Maine.

II.

The Justice presiding in the Superior Court could have believed, reasonably, that his conclusion that defendant had no constitutional right to trial by jury was supported by recent developments.

On May 20, 1971 the Justices of the Supreme Judicial Court of Maine answered, in an advisory opinion, a question propounded by the House of Representatives of the 105th Legislature, Opinion of the Justices, Me., 278 A.2d 693 (1971), whether

a proposed "ACT Permitting Trial for Petty Offenses Without a Jury" would be

"constitutional in view of the language concerning trial by jury in all criminal prosecutions as expressed in the Constitution of Maine, Article I, Section 6 and Article I, Section 7?"

The Justices "advised" that the proposed Act would be unconstitutional. Simultaneously, however, they took the precaution to state:

"In rendering our several opinions as Justices of the Supreme Judicial Court, given in a non-adversary setting, we are ever mindful of the careful distinction which has always been made as between such advisory opinions and decisions of the Law Court." [4] (278 A.2d at p. 695)

Further, the Justices explicitly revealed that Johnson's Case, 1 Me. 230 (1821)—the initial case from which has sprung all the language in subsequent Maine cases affirming an unrestricted constitutional guarantee of jury trial in all criminal prosecutions—had dealt with the constitutional issue only through *dictum*, since

". . . the Court [in *Johnson's Case*] was only obliged to hold that a right of appeal existed [as provided by statute] from a conviction by a Justice of the Peace in a misdemeanor case." (278 A. 2d at p. 695)

Within less than two weeks thereafter, on June 1, 1971, the Supreme Judicial Court, this time acting as the Law Court, judicially decided Newell v. State of Maine, Me., 277 A.2d 731 (1971). In

*Newell* the Court discussed the requirements of Article I, Section 6 of the Constitution of Maine that

"[i]n all criminal prosecutions, the accused shall have a right to be heard by himself and his counsel, or either, at his election; . . . ."

The decision in Newell v. State embraced the distinction, as already given recognition by the Supreme Court of the United States, between "petty" and "serious" violations of the criminal law. The holding in *Newell* was:

". . . all indigent persons who are without attorneys and who are facing criminal charges which might result in the imposition of a penalty of imprisonment for a period of more than six months or a fine of more than $500 or both . . . must be informed by the Court of their right to appointed counsel and must have such counsel appointed unless they waive this right." (p. 738)

Newell v. State had emerged against the background of two recent decisions of the Supreme Court of the United States in which the "petty"–"serious" differentiation of criminal violations had been incorporated into the scope of the right to jury trial as guaranteed by Article III and the Sixth Amendment of the Constitution of the United States to persons accused of criminal violations not only in federal but also in state courts (through the operation of the federal Fourteenth Amendment). Duncan v. Louisiana, 391 U.S. 145, 88 S. Ct. 1444, 20 L.Ed.2d 491 (1968); Baldwin v. New York, 399 U.S. 66, 90 S.Ct. 1886,

---

4. On September 7, 1971 the Justices again stressed this distinction when, in Opinion of the Justices, Me., 281 A.2d 321 (1971), they reminded the Honorable Senate of the State of Maine (as well as all others interested in reading the "Maine Reporter"):
"... imposition [by Section 3 of Article VI of the Constitution of Maine] of an obligation upon the Justices of the [Supreme Judicial] Court to provide opinions outside a context in which an actual controversy between parties is being decid-

ed requires them to exercise powers beyond those traditionally defined as 'judicial.'
"For this reason when such opinions are given pursuant to the requirements of the Maine Constitution, they are the opinions only of each Justice as an individual.
"In such opinions there is no decision to serve as binding precedent.
"The rule of stare decisis does not apply to Justices' Constitutional Advisory Opinions. Fellows v. Eastman (1927), 126 Me. 147, 136 A. 810." (p. 322)

26 L.Ed.2d 437 (1970). A conclusion would appear reasonable, therefore, that the use by the Supreme Court of the United States of the "petty"–"serious" distinction in the delineation of the nature of the federal constitutional guarantee of right to jury in criminal cases would bear materially on the interpretation to be given the guarantee in the Maine Constitution. The textual language of the jury trial guarantee of Article I, Section 6 of the Constitution of Maine resembles that of the Sixth Amendment to the Constitution of the United States. The Newell v. State use of the "petty"–"serious" differentiation in a "criminal prosecution" context would seem to buttress the view that the distinction would be given weight as to any of the provisions of the Maine Constitution dealing with the rights of the accused in "criminal prosecutions."

■ Notwithstanding that pursuant to all of the foregoing the presiding Justice could find respectable support for the conclusion he had reached and may reasonably have believed that this Court would uphold his view, we decide that the Constitution of the State of Maine in Article I, Section 6 guarantees the right of jury trial in *"all* criminal prosecutions" in the most literal and comprehensive sense of the word, "all", (with the exception, of course, expressly stated in the Constitution itself of "trials by martial law or impeachment"). The guarantee of jury trial is without qualification, restriction, or limitation and is thus operative in each and every "prosecution" which is "criminal" notwithstanding that the nature of the violation of the criminal law of which defendant is accused is "petty" rather than "serious."

5. Prior to 1963 the Maine Constitution had no provision containing the words "due process of law." In the years before 1963 the Maine Court had purported to find equivalent substantive content in the language of the last clause of Article I, Section 6:

Foundational to our decision are the reasons for our conclusion that neither the doctrine of Newell v. State, supra, nor the interpretation of the Supreme Court of the United States concerning the scope of Article III and the Sixth Amendment of the federal Constitution as guaranteeing trial by jury in criminal prosecutions affords guidance beneficial in the assessment of the scope of the trial by jury guarantee of Article I, Section 6 of the Constitution of Maine.

As we have already observed, Newell v. State decided the extent to which the Constitution of Maine commands that an indigent person facing criminal charges shall have counsel appointed for him. Although the Court in the course of its opinion noted that Article I, Section 6 of the Constitution of Maine provides that "in all criminal prosecutions" the accused is guaranteed

"a right to be heard by himself and his counsel, or either, at his election",

the Court simultaneously explained that

"at the time of the adoption of our constitutional guarantees the right to counsel was not, . . . understood to include the right to appointment of counsel for an indigent defendant . . . ." (pp. 734, 735)

For this reason, *Newell* predicated the right of an indigent person facing criminal charges to have counsel appointed for him *not* on the "right of counsel" provision of Article I, Section 6, but, rather, on the "due process" clause which had been explicitly written into the Constitution of Maine by an Amendment in 1963 and which now appears as Article I, Section 6–A.[5]

" . . . nor be deprived of . . . life, liberty, property or privileges, but by judgment of his peers or the law of the land."

The Court reasoned that (as of 1963 and thereafter) "due process" had come to embody

". . . deepening appreciation of the principles of the social sciences and of human values",

as the result of which

"concepts of judicial fair play have steadily evolved." (p. 737)[6]

Hence, the opinion in *Newell* decided *strictly in such "due process" terms*:

"We are convinced that the time has come when *due process* demands that we . . . construe our own constitution to require appointment of counsel for needy persons charged with serious misdemeanors, unless waived." (p. 737) (emphasis supplied)

Further, it was solely to satisfy "the demands of due process" (and, perhaps, of "equal protection") that the distinction between "petty" and "serious" was introduced *in Newell* as

"a fair standard . . . to balance the public interests and the individual's *rights under due process*." (p. 738) (emphasis supplied)

*Newell* would be wrongly interpreted were it conceived to have carry-over extension to Article I, Section 6 of the Maine Constitution or to import that the explicit textual language of that Section, "in all criminal prosecutions", may be differentially subdivided to serve various particular purposes according to a criterion of whether the "criminal prosecution" is for a "petty" or a "serious" criminal violation.

The decisions of the Supreme Court of the United States construing Article III and the Sixth Amendment of the federal Constitution guaranteeing right of trial by jury in federal and (through the Fourteenth Amendment) state courts, rest on *two fundamental propositions*: (1) so-called "petty" violations of the criminal law

"were tried without juries both in England and in the Colonies" (Duncan v. Louisiana, supra, 391 U.S. at p. 160, 88 S.Ct. at p. 1453);

and (2)

"[t]here is no substantial evidence that the Framers intended to depart from this established common-law practice, . . . ." (Duncan v. Louisiana, supra, *391 U.S. at p. 160, 88 S.Ct. at p. 1453*)

The second proposition is taken to be supported not only extrinsically but also by the internal interrelationship between the textual language contained in Article III and the Sixth Amendment insofar as the conceivably all-inclusive wording of the Sixth Amendment, in *"all* criminal prosecutions", (emphasis supplied) tends to be narrowed by the language of Article III, "The Trial of all *Crimes* . . . ." (emphasis supplied) It has been thought that in the 18th and early 19th Centuries the word, "crimes", was used and generally understood to signify the "serious", in contradistinction to the "petty", violations of the criminal law and thus had a more restricted connotation than "criminal prosecutions" or "criminal offenses." [7]

Analysis discloses that neither of the aforesaid propositions foundationally supporting the interpretation given to the Constitution of the United States has meaningful applicability to the Maine experience against the background, and as a

6. This Court has long recognized that "governmental fair play" is the essence of "due process." State v. Munsey, 152 Me. 198, 201, 127 A.2d 79 (1956) quoting from In re John M. Stanley, 133 Me. 91, 95, 174 A. 93 (1934).

7. See: Schick v. United States, 195 U.S. 65, 70, 24 S.Ct. 826, 49 L.Ed. 99 (1904).

See also: Frankfurter and Corcoran, Petty Federal Offenses and the Constitutional Guaranty of Trial by Jury, 39 Harv.L.Rev. 917, 969–975, 978, 979 (1926). But see: Kaye, Petty Offenders Have No Peers!, 26 U.Chi.L.Rev. 245, 249–261 (1959).

part, of which the Constitution of the State of Maine was written and adopted.

Although it may be acknowledged that in the Colonies, generally, there were many violations of the criminal law held to be excluded from the operative scope of the principle of trial by jury,[8] the attitude in Massachusetts, and in the District of Maine as a part of Massachusetts, was strikingly different. As recognized in Frankfurter and Corcoran, n. 7, supra:

> "The 'Puritan's characteristic jealousy of the magistrate' and the strong impulse to a popular form of justice, which came from the close-knit kinship of New England religious congregations, led these colonies to a more restricted use of the familiar summary powers by magistrates than the records of other colonies disclose. The history of Massachusetts Bay is typical of the thought and practice of the New England settlements, which it so largely dominated." (p. 938)

> "The whole gamut of conduct, which in England was tried by magistrates with appeal to magistrates, was in Massachusetts tried by magistrates with appeal to juries. Massachusetts usage thus recognized the right to trial by jury, theoretically at least, in regard to petty offenses for which the law of England did not afford the protection of a jury." (pp. 940, 941)

That Massachusetts and the District of Maine had thus uniquely deviated from prevalent conceptions of the reach of the principle of trial by jury in criminal cases is fully corroborated by the contemporaneous writing of three persons who surely had personal knowledge of the system and were superbly equipped thoroughly to understand and clearly describe it. They were Prentiss Mellen, C. J., William P. Preble, J., and Nathan Weston, Jr., J., the Chief Justice and Associate Justices of the Supreme Judicial Court, who, within one year and a half after the Constitution of Maine was adopted, wrote *Johnson's Case*, supra. They explicitly described the nature of the "trial by jury" principle as it was *statutorily* (Massachusetts Stat.1783, Chapter 51) embodied in Massachusetts and the District of Maine:—

> "an appeal was granted, in all criminal cases, from the sentence of a Justice of the peace"

to enable the accused to have a jury trial in the appellate tribunal, this right to trial by jury "on appeal" having

> "been abridged in some instances, by particular statutes;—but in all other cases . . . understood to exist in full force." (p. 230)

Thus, in Massachusetts and Maine the principle that a defendant charged with a criminal violation is entitled to a trial by jury encompassed not only the "serious" but also the "petty" violations of the criminal law.[9] Here, the first basic factor which played a critical role in the approach of the Supreme Court of the United States to Article III and the Sixth Amendment of the federal Constitution, because basically contradicted by the special historical experience in Maine, is without materiality to the interpretation of Article I, Section 6 of the Constitution of Maine.

---

8. See: Frankfurter and Corcoran, n. 7, supra, at pp. 934–968. But see: Kaye, n. 7, supra, at pp. 248–257.

9. Even as late as 1857 the Massachusetts Court described the conception of the "right to jury trial" as it was "generally understood and practiced here and in Maine" to have been:

> "[W]here, by the terms of any law, a justice of the peace or police court has been authorized to hear and pass sentence, it has always been accompanied by a right to appeal [with trial by jury afforded in the appellate court]; . . . [the right to trial by jury] is not violated by an act of legislation, which authorizes a single magistrate to try and pass sentence, provided the act contains a provision that the party shall have an unqualified and unfettered right of appeal, and a trial by jury in the appellate court, . . . ." Jones v. Robbins, 8 Gray (Mass.) 329, 341 (1857)

Further,—and again as strikingly confirmed by the writings of the knowledgeable and skilled men who expressed themselves in *Johnson's Case,* supra,—the Massachusetts and Maine experience was sharply contrary to that depicted in the second proposition relied upon by the Supreme Court of the United States.

If it be correct that there

"is no substantial evidence that the Framers [of the Constitution of the United States] intended to depart . . ."

from the principle of right to trial by jury as conceived in England and in most of the Colonies to be inapplicable to "petty" criminal violations (an exclusion, however, which Massachusetts and Maine had refused to recognize), the Justices who wrote in *Johnson's Case* have provided us with the most cogent evidence that the Framers of the Constitution of Maine deliberately aimed and intended precisely (1) to depart from the principle of trial by jury as it was conceived in England and most of the Colonies and (2) to preserve intact and inviolate the special approach to which Massachusetts and the District of Maine had been committed.

Having first carefully explained that special approach as the principle that, notwithstanding the nature of the criminal violation as "petty" or "serious",

"the accused must, of necessity, be entitled to an appeal from the sentence of a Justice of the peace, who tries without the intervention of a jury, to the Circuit Court of Common Pleas, where a trial by jury may be had' . . . " (p. 230),

the Justices in *Johnson's Case* proclaimed that Article I, Section 6 of the Maine Constitution was calculated to ensure that this entitlement of the defendant which in Massachusetts and the *District* of Maine (as a part of Massachusetts) had only the protection of *statute* would in Maine *as a State* rest on "a more durable basis than the pleasure of the legislature." (p. 230)

Although these comments of the Justices in *Johnson's Case* may be dicta and, therefore, lack the controlling effect of judicial precedent, they express thoughts which are nonetheless enormously weighty as evidence of the content conveyed by the words of Article I, Section 6 of the Maine Constitution. Because of the stature of the men who were speaking, their expertness and the timing of their words as practically contemporaneous with the adoption of the Constitution, we attribute to the remarks in *Johnson's Case* an evidentiary cogency practically equivalent to that of statements made in debate by members of the Constitutional Convention speaking to support a proposed draft worded exactly in the language in which Article I, Section 6 was ultimately adopted.[10]

Indeed, we are fully satisfied that it was this potency of the statements in *Johnson's Case* as a contemporaneous expression of the meaning and purpose of Article I, Section 6 of the Constitution of Maine which impelled this Court, frequently and undeviatingly thereafter, to consider the views stated in *Johnson's Case* to be unquestionably correct and to require no subsequent reassessment to determine whether qualifications or restrictions should be introduced in the light of decisions being made by courts in other states on similar issues. See: Saco v. Wentworth, 37 Me. 165

---

10. One of the Justices in *Johnson's Case,* William P. Preble, was a member of the Constitutional Convention and a signer of the Maine Constitution.

Of the Chief Justice in *Johnson's Case,* Prentiss Mellen, who was born in Sterling, Massachusetts and had early practiced law in Massachusetts, it has been said: "From 1804, until his appointment as Chief Justice in 1820, Mr. Mellen practiced in every county . . . [in Maine], and was engaged in every prominent cause." Willis, Lawyers and Courts of Maine, p. 166. He had been elected in 1817 as a United States Senator from Massachusetts and resigned from that office to accept appointment in July, 1820 as Chief Justice of the Supreme Judicial Court of Maine.

(1853); State v. Gurney, 37 Me. 156 (1853); Saco v. Woodsum, 39 Me. 258 (1855); State v. Intoxicating Liquors, 80 Me. 57, 12 A. 794 (1888); Sprague v. County of Androscoggin, 104 Me. 352, 71 A. 1090 (1908).

One further critical difference between the Constitution of Maine and the Constitution of the United States, as bearing upon the right of trial by jury in "all criminal prosecutions", is worthy of mention. We noted previously (ante, pp. 166–167) that the use of the words, "Trial of all *Crimes*", (emphasis supplied) in Article III of the federal Constitution had been thought to restrict the broader connotations of the language, "in all criminal prosecutions", appearing in the Sixth Amendment; and this was taken as internal evidence that the Framers of the Constitution of the United States had intended no departure from the attitude of England and most of the Colonies that the "right of trial by jury" existed only as to the "serious", rather than "petty", criminal violations.

Internal evidence deriving from the textual language of the Constitution of Maine, however, points strongly to the opposite conclusion.

Absent in the language of the Maine Constitution is a use of the word, "Crimes", in conjunction with the expressed guarantee of the right to trial by jury, thereby to suggest that as guaranteed "in all criminal prosecutions" the right of trial by jury might, arguably, be held qualified, limited or restricted insofar as "crimes" was understood in the late 18th and early 19th Centuries to connote only the "serious" violations of the criminal law.

In addition, that the text of Article I, Section 6 of the Maine Constitution, " . . . *all* criminal prosecutions", (emphasis supplied) means precisely what it says—"*all*"—without qualification, restriction, or limitation of any kind (except, of course, for the exclusion expressly stated in Article I, Section 6, itself, "trials by

martial law or impeachment") is confirmed by the text of another section of Article I. Section 7 of Article I reads in pertinent part:

> "No person shall be held to answer for a capital or infamous crime, unless on a presentment or indictment of a grand jury, *except . . . in such cases of offences, as are usually cognizable by a justice of the peace, . . . .*" (emphasis supplied)

As originally proposed to the Constitutional Convention, Section 7 of Article I had omitted the exception for "such . . . offenses, as are usually cognizable by a justice of the peace." This language was added, and adopted, as a result of the following discussion in the Convention.

> "Mr. Wallingford, observed, that magistrates, by the law as it now stands, have the power to punish petty larceny and other offenses *which are infamous*. This section will take that power from them which it may be desirable for them to exercise.

> "Mr. Holmes proposed to insert the words 'or in such cases of offenses, as are usually cognizable by a Justice of the Peace' (which were not in the report.) This would meet the wishes of the gentleman last up, and answer the purpose required. This amendment was accepted." (emphasis supplied) Debates and Journal Constitutional Convention of Maine 1819–1820, p. 118

Appropriate understanding of the import of this colloquy requires the further explanation that currently in Maine, by reason of the decisions in Butler v. Wentworth, 84 Me. 25, 24 A. 456 (1891) and State v. Vashon, 123 Me. 412, 123 A. 511 (1924), a violation of the criminal law is defined as "infamous" strictly in terms of the punishment authorized to be given for it—with the result that "infamous" violations of the criminal law (now defined to be those punishable by a year or more of

imprisonment) are not (and may not be) within the sentencing power of a Justice of the Peace (magistrate) and, therefore, are no longer "cognizable by a Justice of the Peace." At the time of the writing of the Constitution of Maine, however, a violation of the criminal law was adjudged "infamous" on the basis of the nature of the conduct involved in the criminal activity as evaluated by factors other than the punishment which the law authorized for it. As was said in State v. Vashon, supra:

> "Under the earlier decisions, both in England and this country, the courts inclined to the doctrine that it is the nature of the crime, and not the punishment, which renders it infamous." (p. 415, 123 A. p. 513)

See also: Butler v. Wentworth, 84 Me. 25, 30, 31, 24 A. 456 (1891) and State v. Cram, 84 Me. 271, 273, 24 A. 853 (1892).

Thus, in the colloquy above quoted Mr. Wallingford was calling attention to the point that under the practice then prevailing there were various violations of the criminal law regarded as "infamous" but as to which, because they were not too severely punishable, authority was given to Justices of the Peace to *impose sentence* (rather than merely to find probable cause and bind over). The "Wallingford-Holmes" discussion establishes that because the drafters of Article I, Section 7 believed it wise to retain, rather than change, such then-existing authority of Justices of the Peace, they inserted as an explicit exception to the requirement of grand jury "presentment or indictment":

> "such cases of offenses, as are usually cognizable by a justice of the peace."

The point is most significant concerning the meaning of Article I, Section 6. It reveals in highly concrete fashion that among the drafters of the Constitution of Maine were men who, manifestly, had highly technical knowledge of the authority of Justices of the Peace in the District of Maine as a part of Massachusetts to im-pose sentence for violations of the criminal law.

· It is inconceivable that these men would have brought their knowledge to bear, as they did, in the drafting of Article I, Section 7 but yet would have forgotten it, or put it aside, in the writing of Article I, Section 6. Thus, the conclusion is unavoidable that it was with a total awareness that Massachusetts and the District of Maine—differently from England and most of the Colonies—had given the principle of the right to trial by jury concrete institutional embodiment in a system under which, notwithstanding that the violation of the criminal law before Justices of the Peace (magistrates) might be "petty", "minor", "serious", or even "infamous", any sentence imposed by a Justice of the Peace (magistrate) was subject to a right of the accused to "appeal" to a Court in which the accused would have available to him the right to a trial by jury.

What the drafters wrote in Article I, Section 7 establishes most forcefully that had the drafters of Article I, Section 6 intended to produce a change in the right to trial by jury as it had been institutionally recognized by statute in Massachusetts and the District of Maine, a change whereby "petty" violations of the criminal law would be excluded from the constitutional guarantee, they surely would *not* have written as they did: "in all criminal prosecutions . . .." As strikingly shown by the exception explicitly referring to the practice before Justices of the Peace written into Article I, Section 7, if the Framers of the Constitution of Maine wished either to retain or change the practice before Justices of the Peace, or the relationships between sentence imposed by Justices of the Peace and the right to trial by jury, they well knew how to accomplish their objectives.

We find it incontestable that by the language in Article I, Section 6 guaranteeing the right of trial by jury "in *all* criminal prosecutions" (emphasis supplied), the

Framers of the Constitution of Maine purposefully sought to ensure that the right of trial by jury be guaranteed to the accused in each and every criminal prosecution without limitation, restriction or qualification as to whether the subject-matter of the prosecution is a "petty" or "serious" violation of the criminal law.[11]

■ The defendant had a constitutional right to trial by jury of which he was deprived by the ruling of the Justice of the Superior Court.

### III.

This decision reflects no lofty detachment from the urgent difficulties currently besetting the administration of justice in this State.[12] It expresses, rather, the highest measure of devotion to the Constitution of Maine as the charter for a long continuing structure of government designed to reconcile a successfully functioning society's need for order and collective power of action with a grant of maximum freedom to the individual citizen—particular institutional modes to protect the liberties of the individual having been explicitly selected as enduringly guaranteed (though this may become contrary, from time to time, to the attitudes prevailing among even a majority of the people).

To maintain such an ordered and collectively potent society consistently with an assurance of maximum individual liberty, it was found necessary to confer upon a meager few persons, acting as a judicial tribunal of last resort, the power to interpret the meaning of the Constitution. The power is awesome in the supremacy, finality and enormity of the effects of its exercise upon the well-being of the government and the lives, property, welfare and liberties of the citizenry.

Those who are privileged, therefore, to enjoy the power are under sworn duty to be unceasingly vigilant and self-restrained lest, under the pressures to respond to periodic exigencies, the call to construe meaning may be the siren's lure to construct amendment of the Constitution.

The present opinion is the statement of our profound conviction that we know the truth of the mandate imposed by Article I, Section 6 of the Constitution of Maine upon future generations. The decision we have reached is thus the only decision open to us if ours is to remain a government of laws and not of men—a government in which the decisions of Courts have the

11. Whether contempt proceedings insofar as, on occasion, they may seek to achieve objectives analogous to those of the criminal law lie within the scope of the jury trial guarantee of Article I, Section 6 is not presently before us; and our decision in this case does not purport to settle the question.

Should the issue come forward for decision at a later time, one factor to be considered would be the statement of this Court in Cushman v. Mackesy, 135 Me. 490, 200 A. 505 (1938) quoting from Chief Justice Taft in Ex parte Grossman, 267 U.S. 87, 117, 45 S. Ct. 332, 69 L.Ed. 527 (1925) :

" 'Contempt proceedings are *sui generis* because they are not hedged about with all the safeguards provided in the bill of rights for protecting one accused of ordinary crime from the danger of unjust conviction.' " (p. 499, 200 A. p. 511)

12. We are acutely sensitive to the burdens imposed upon the Superior Court and the great expense to the taxpayers which can

result from the accused's having a right to jury trial no matter how trivial the violation of the criminal law. We know, too, of the abuses which can arise from bad faith resort to the constitutional guarantee of jury trial to achieve strategic benefits lying outside the protections intended by the constitutional right. The Maine House of Representatives mentioned some of these evils in the formulation of the question it propounded to the Justices of the Supreme Judicial Court in 1971. The Legislature observed that (1) "there is developing a large backlog of criminal cases in the Superior Court throughout the State because of appeals of petty offenses from the District Court ostensibly for the purpose of having a jury trial; . . . " and (2) "many of these petty offenses are never tried before a jury but are dismissed or otherwise disposed of, they being matters which involve an inordinate amount of time of the court and court officials; . . . ." See: Opinion of the Justices, Me., 278 A.2d 693 (1971).

force of law only as they are dictated by principles derived from reason, and its processes, rather than the personal policy choices of that handful of persons who happen, at any given moment, to possess judicial power.

In the depths of conscience we are sure that by our decision today we fulfill the oath, taken by each of us, to support the Constitution of the State of Maine.

The entry is:

(1) The Superior Court's order of remand to the District Court is vacated; and

(2) the case is remanded to the Superior Court for further proceedings pursuant to 15 M.R.S.A. § 2114 (as amended) and not inconsistent with this opinion.

All Justices concurring.