Carmelo CLAUDIO, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Enrique MAYMI, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Supreme Court of Delaware.

Submitted: Feb. 6, 1990.
Decided: Jan. 22, 1991.
Rehearing Denied Feb. 11, 1991.

Loren C. Meyers, Esquire, Deputy Atty. Gen., Dept. of Justice, Wilmington, for appellee.

Bernard J. O'Donnell, Asst. Public Defender, Office of the Public Defender, Wilmington, for appellants.

Before HORSEY, MOORE, WALSH, HOLLAND, JJ., and HARTNETT, Vice Chancellor (sitting by designation pursuant to Del. Const. art. IV, § 12), constituting the Court en Banc.

HOLLAND, Justice:

The defendants-appellants, Carmelo Claudio ("Claudio") and Enrique Maymi ("Maymi"), appeal their convictions, following a joint trial before a jury, in the Superior Court. Both defendants were convicted, as charged, of Robbery in the First Degree, four counts of Possession of a Deadly Weapon During the Commission of a Felony, two counts of Conspiracy in the First Degree and one count each of Murder in the First Degree and Attempted Murder in the First Degree. These charges arose out of a series of events which transpired during the early morning hours of February 14, 1987.

Following a penalty hearing, the jury was unable to reach a unanimous decision to recommend the imposition of a death sentence for either defendant. Claudio and Maymi were each sentenced to serve a life

term, without probation or parole for the conviction of Murder in the First Degree. Each defendant received a second life sentence, albeit with the possibility of probation or parole, for the conviction of Attempted Murder in the First Degree. Each defendant was also sentenced to an additional forty-five years of imprisonment for the remaining offenses. All of the sentences are to be served consecutively by Claudio and Maymi.

The direct appeals of these two defendants were filed separately in this Court. However, because Claudio and Maymi were tried jointly in the Superior Court and, since the claims presented on appeal are identical, their cases have been consolidated. The defendants each raise the same three issues for our review. First, that the trial judge erred in not giving an immediate curative instruction or declaring a mistrial after sustaining an evidentiary objection by the defense. Second, that the trial judge gave an incorrect and confusing instruction on accomplice liability. Third, that the trial judge improperly substituted an alternate juror for a regular juror after deliberations had begun. We find no reversible error in the Superior Court proceedings. Therefore, we affirm all of the convictions of each defendant.

## BASIC FACTS

On Friday, February 13, 1987, the victims, Juan Soto ("Soto") and Rafael Lopez ("Lopez"), were paid by their employers. They decided to go to a bar to listen to Spanish music. An acquaintance drove them from Avondale, Pennsylvania to the Spinning Wheel Inn, a tavern near Kaolin, Pennsylvania. Soto and Lopez arrived at the Spinning Wheel at approximately 7:00 p.m. They remained at the tavern until shortly before closing at 1:30 a.m. on February 14.

Since they did not have a ride home, they began to ask other patrons for transportation back to Avondale. Their initial efforts were unsuccessful. Soto and Lopez then walked outside the tavern where they saw two men, later identified as the defendants, Claudio and Maymi, sitting in a car. Lopez

asked the defendants if they could give him and Soto a ride back to Avondale. The defendants agreed in return for ten dollars for gas. Lopez gave the defendants ten dollars, and accompanied by Soto, left the Spinning Wheel parking lot in the defendants' car. Maymi was driving. Claudio was beside him. Soto and Lopez were both on the back seat.

Upon leaving the Spinning Wheel parking lot, Maymi turned left onto Route 41 towards Delaware, instead of right towards Avondale as Lopez and Soto had requested. A short time later, the defendants' vehicle turned from Route 41 onto Centerville Road near Hockessin, Delaware. There Maymi stopped the car. Claudio demanded that Soto and Lopez hand over all of their money. Soto exited the car and attempted to flee. However, Claudio struck Soto in the face twice and then stabbed him in the chest. Soto fell to the ground and Claudio removed several hundred dollars from his pockets. While on the ground, Soto heard Lopez scuffling with both of the defendants. He then heard the car drive away.

Detective John Downs ("Downs") of the New Castle County Police arrived at the crime scene early on the morning of Saturday, February 14. Lopez's dead body was on the side of the road. There was also evidence that another injured person had left the crime scene. Soto was discovered later that afternoon a short distance from where the attack had occurred. He was taken to Christiana hospital. While at the hospital, Soto, who spoke little English, was questioned by Downs through an interpreter about the attack. Soto gave his account of the events of the previous evening, which included a detailed description of the two assailants.

After speaking with Soto, Downs returned to the Spinning Wheel Inn. There, he questioned a female bartender about Soto and Lopez. She told Downs that both Lopez and Soto had been at the Spinning Wheel the previous evening. She recalled that they had asked her for a ride home. After she declined their request, she saw Lopez and Soto attempting to solicit a ride from two men. She described those men for Downs.

The police investigation resulted in information which indicated that Soto and Lopez had left the Spinning Wheel Inn in a car with Claudio and Maymi. Soto was able to pick both of the defendants out of a photographic line-up. The police arrested Claudio and Maymi on February 20, 1987. Both of them were subsequently indicted on charges of Murder in the First Degree and the related felonies. At trial, Soto identified Maymi and Claudio as the assailants.

## INSTRUCTION ON INADMISSIBLE EVIDENCE

The defendants' first contention on appeal is that the trial judge erred in not giving an immediate curative instruction or declaring a mistrial, after sustaining a defense objection to the State's request to admit two kitchen knives into evidence. Those knives had been seized by the police from under the mattress in the master bedroom of Maymi's home. The State did not contend that the two knives were the weapons used to assault Lopez and Soto. The State acknowledges that the knife or knives used in this incident were never discovered. However, the State argued that the two knives found under the mattress in the bedroom of Maymi's home were admissible to infer that Maymi had a proclivity to possess knives.[1]

Counsel for Maymi objected to the admission of the two knives on grounds of relevance. The trial judge sustained that objection. Counsel for Maymi then requested that a curative instruction be given to the jury immediately. In response to that request, the State continued to argue the

---

1. THE PROSECUTOR: Your Honor, in the State's view, although admittedly, we are not asserting or even suggesting that they were the weapons of this murder, they certainly indicate a proclivity for Maymi or whoever slept in the master bedroom to possess knives, whether it would be for the protection of that particular occupant of that room or not, it doesn't matter. The fact that Maymi would have access to knives is, I believe, albeit, not strongly, but at least relevant to an extent.

relevance of the knives.[2] The trial judge reiterated his ruling that the knives were not admissible as evidence.[3] However, no curative instruction was given to the jury by the trial judge at that time.

At a later time in the trial, counsel for Claudio moved for a mistrial. He asserted that the trial judge's prior failure to give a contemporaneous curative instruction and the State's argument that the knives were relevant to show a proclivity on the part of Maymi, and by implication Claudio, to carry and use knives was highly prejudicial. The trial judge denied the motion for a mistrial. However, in his final charge, the trial judge did instruct the jury that "[a]ny offer of evidence that has been rejected by me ... must not [be] consider[ed]."

The defendants argue that, although the two kitchen knives were not entered into evidence, they were prejudiced by the display of those knives and the State's argument on their admissibility before the jury. The defendants submit that prejudice was not cured by the trial judge's subsequent instruction in the final charge to the jury.

■■■ The mere fact that an evidentiary objection is sustained does not make the attempt to introduce inadmissible evidence prejudicial *per se*. *See Bennett v. State*, Del.Supr., 164 A.2d 442, 446 (1960). In this case, a contemporaneous instruction might have been preferable. *Cf. Boatson v.*

*State*, Del.Supr., 457 A.2d 738, 743 (1983). However, we find that the trial judge did not abuse his discretion in declining the defense request for an immediate curative instruction. *Compare Bromwell v. State*, Del.Supr., 427 A.2d 884, 892–93 (1981). We are satisfied the instruction ultimately given by the trial judge to disregard any offer of any evidence which had been rejected by the court effectively removed any potentially prejudicial effect caused by the State's attempt to offer the two knives into evidence.[4] The Superior Court's decision to deny the defense motion for a mistrial is affirmed. *See Shantz v. State*, Del.Supr., 344 A.2d 245, 247 (1975).

## ACCOMPLICE LIABILITY INSTRUCTION

The defendants' second claim of error involves the instruction given to the jury by the trial judge concerning felony murder and accomplice liability. The trial judge declined to instruct the jury on the issue of accomplice liability in the form requested by the defense. Over the defendants' objections, the trial judge instructed the jury, in part, as follows:

Now, there is another rule of law which has application here. It is the law that all persons who join together with a common intent and purpose to commit an

---

**2.** THE PROSECUTOR: The point of the identification, Your Honor, was that the knives were not found or seized from the kitchen. If they had been in the kitchen, obviously they would not have been seized.

The fact that they were in the bedroom, to my point of view, is no different than if there had been a gun in the bedroom.

DEFENSE COUNSEL: Your Honor, the Court's ruled. Now the prosecutor is making an argument in front of the jury after you ruled.

**3.** THE COURT: I am going to rule that these knives are not admissible, if offered. You are not offering them based upon my ruling and I will ask you to go on.

THE PROSECUTOR: Very well.

**4.** We note that in addition to the instruction given to the jury on this subject during the final charge, the Delaware Pattern Jury Instructions provide for the following instruction to be given to the jury after the attorneys' opening statements:

Counsel may sometimes present objections to some of the testimony or other evidence. It is the duty of a lawyer to object to evidence which he believes may not properly be offered, and you should not be prejudiced in any way against a lawyer who makes objections or the party he represents. At times I may sustain or uphold objections, or direct that you disregard certain testimony or exhibits. You must not consider any evidence to which an objection has been sustained or which I have instructed you to disregard. At other times, I may overrule objections, in which case you are free to consider the evidence which has been offered.

*Delaware Pattern Jury Instructions 1C.* This introductory instruction is given, as a matter of discretion, at jury trials in Delaware. However, since that portion of the trial record was not transcribed, we do not know if such an instruction was actually given. Nevertheless, in this case, we have concluded that the instruction in the final charge was sufficient.

unlawful act which, in itself, makes it not improbable that a crime not specifically agreed upon in advance might be committed, are responsible equally as principals for the commission of such an incidental or consequential crime, whenever the second crime is one in furtherance of or in aid to the originally contemplated unlawful act.

The defendants contend that, in defining accomplice liability, the trial judge used language which misstated the present substantive law as set forth in 11 *Del.C.* § 271.[5] They also claim that the trial judge's use of a double negative in describing the natural and probable consequences of the conduct of one defendant as attributable to the other defendant misled the jury.

 A defendant has no right to have the jury instructed in a particular form. However, a defendant is entitled to have the jury instructed with a correct statement of the substantive law. *Miller v. State,* Del.Supr., 224 A.2d 592, 596 (1966). In addressing the issue of accomplice liability, this Court has said:

> The inquiry under § 271 is not whether each accomplice had the specific intent to commit murder, but whether he intended to promote or facilitate the principal's conduct constituting the offense. The defendants did not have to specifically intend that the result, a killing, should occur. As long as the result was a foreseeable consequence of the underlying felonious conduct their intent as accomplices includes the intent to facilitate the happening of this result.

*Hooks v. State,* Del.Supr., 416 A.2d 189, 197 (1980), *cited with approval in Martin v. State,* Del.Supr., 433 A.2d 1025, 1029 (1981), *cert. denied,* 454 U.S. 1151, 102 S.Ct. 1018, 71 L.Ed.2d 306 (1982). Thus, Delaware law requires the jury to unanimously find that a principal-accomplice relationship existed between the participants with respect to a particular charge, e.g., in this case, robbery at knife point. *Probst v.*

*State,* Del.Supr., 547 A.2d 114, 123 (1988). However, the jury is not required thereafter to find that the defendants specifically intended the result of a consequential crime which occurs, e.g., in this case, murder and attempted murder. *Id.* In *Martin,* for example, the defendants originally agreed to burglarize a home for the purpose of stealing weapons. *Martin v. State,* 433 A.2d at 1028. This Court held that both were properly charged, pursuant to 11 *Del.C.* § 271, with the murder committed in furtherance of the burglary to steal weapons.

██ The facts in the record reflect that Claudio and Maymi were together at the time of the fatal stabbing. There is some dispute as to which of the two defendants inflicted the fatal wounds upon Lopez. However, there appears to be no question that the defendants conspired to rob the decedent, Lopez, and his companion, Soto, on the night in question at knife point. The instruction on accomplice liability which was given in this case, correctly informed the jury that, if it unanimously concluded that the defendants agreed to rob the victims at knife point, either defendant might have functioned as an accomplice who intended to promote or facilitate the subsequent acts of the other defendant as a principal and both were equally guilty of the consequential crimes of murder and attempted murder. We find that the instruction on accomplice liability which was given in this case, considered as a whole, was a correct statement of the present substantive law. *See Probst v. State,* Del. Supr., 547 A.2d 114 (1988); *Martin v. State,* 433 A.2d at 1029; and *Hooks v. State,* 416 A.2d at 197.

██ The defendants also contend that the jury was misled because the trial judge used a double negative in the instruction on accomplice liability. A trial judge's charge to the jury will not serve as grounds for reversible error if it is "reasonably informative and not misleading, judged by com-

---

**5.** 11 *Del.C.* § 271(2)(b) provides in pertinent part:

A person is guilty of an offense committed by another person when ... [i]ntending to promote or facilitate the commission of the offense he ... [a]ids, counsels or agrees or attempts to aid the other person in planning or committing it....

mon practices and standards of verbal communication." *Baker v. Reid,* Del.Supr., 57 A.2d 103, 109 (1947), *quoted in Sheeran v. State,* Del.Supr., 526 A.2d 886, 894 (1987). In evaluating "the propriety of a jury charge, the entire instruction must be considered with no statement to be viewed in a vacuum." *Id.* at 109 (citation omitted). The instruction given by the trial judge in this case was somewhat awkward in its phraseology. However, we are satisfied that the use of a double negative did not undermine the ability of the jury "to intelligently perform its duty in returning a verdict." *Storey v. Castner,* Del.Supr., 314 A.2d 187, 194 (1973).

## PROCEDURAL FACTS

### SUBSTITUTION OF ALTERNATE JUROR DURING DELIBERATIONS

The defendants' third claim of error presents a novel question in this jurisdiction. The defendants contend that the trial judge improperly substituted an alternate juror for a regular juror after the jury's deliberations had begun. Before the twelve jurors retired to deliberate on the guilt/innocence phase of the trial, the trial judge read his instructions to the twelve regular jurors and the three alternates.[6] When the jury had not reached a verdict at 5:00 p.m., it was sequestered separately as required by 11 *Del.C.* § 4209(b).[7]

6. The trial began with four alternates. One alternate juror was substituted for a regular juror prior to commencement of jury deliberations. Super.Ct.Crim.R. 24(c).

7. Since the defendants were subject to a hearing to determine the issue of capital punishment, upon conviction for first degree murder, the jury deliberations were bifurcated as required by 11 *Del.C.* § 4209(b) which provides in pertinent part:

Alternate jurors shall not be excused from the case prior to submission of the issue of guilt to the trial jury and shall remain separately sequestered until a verdict on guilt is entered. If the verdict of the trial jury is guilty of first-degree murder said alternates shall sit as alternate jurors on the issue of punishment. If, for any reason satisfactory to the Court, any member of the trial jury is excused from participation in the hearing on punishment, the trial judge shall replace such juror or jurors with alternate juror or jurors....

The jury began its deliberations at approximately 10:30 a.m. on December 1, 1987. During the first day of deliberations, the jury requested a view of the face of the defendant, Claudio. The trial judge acceded to this request. The twelve jurors and the three alternates were brought back into the courtroom to view Claudio. When the jury had not reached a verdict at 5:00 p.m., it was sequestered for the night.

During the night, one of the regular jurors became ill. The next morning, December 2, he was excused by the trial judge. The trial judge decided to replace the ill juror with one of the alternates, who had been separately sequestered during the first day of deliberations. Defense counsel moved for a mistrial. That motion was denied.

The judge asked the three alternates if they had discussed the case among themselves during their sequestration.[8] The alternates stated they had not discussed the case. The trial judge then permitted the first alternate to become a member of the regular jury in place of the incapacitated juror. Thereafter, the trial judge gave a special instruction to the reconstituted jury. In particular, he instructed the jury to begin its deliberations anew and emphasized the importance of the alternate familiarizing herself with the views of the other eleven jurors.[9]

8. THE COURT: Lady and gentlemen, Mr. Mulvenna became ill during the evening. I presume you may know that, since were you [sic] down there. I had to excuse him this morning. That basically means Mrs. Johnson will now become juror No. 7.

Before I bring in the other jurors and give them all a general instruction, I would like to ask all three did you, did you [sic] discuss this case at all since yesterday morning at 10:30 when deliberations started?

JURORS: No, we only played cards.

THE COURT: You didn't discuss this case; you haven't read about it; you haven't seen anything?

JURORS: No.

9. The trial judge had conferred with all counsel concerning what the reconstituted jury should be told. The prosecutor proposed that the newly seated alternate be instructed that "she has the absolute right to make sure she's brought up-to-date." The instruction actually given was

The reconstituted jury began its deliberations at approximately 9:30 a.m. It deliberated until approximately 5:00 that evening, breaking only for lunch. The jury reconvened at approximately 10:00 a.m. on December 3. It deliberated until it took a break for lunch at noon. The jury continued deliberating after lunch. At approximately 2:00 p.m., the jury indicated that it had arrived at verdicts on all charges. Thus, the jury deliberated six and one-half hours prior to the substitution of the alternate juror and the reconstituted jury deliberated "anew" for approximately nine and one-half hours.[10]

## SUPERIOR COURT CRIMINAL RULE 24(c)

## SUBSTITUTION OF ALTERNATE JUROR DURING DELIBERATIONS

The defendants argue that the trial court's substitution of an alternate juror after the jury had retired to deliberate was in contravention of Superior Court Criminal Rule 24(c).[11] The defendants correctly note

based, in substantial part, on a draft submitted by one of the defense counsel.

> THE COURT: Ladies and gentlemen of the jury, as you are aware, Mr. Mulvenna has been excused because of illness and this means that Mrs. Johnson will now become juror No. 7. And Mrs. Johnson, I will ask you to take that seat.
>
> Although Mrs. Johnson has been present throughout the entire trial in this case and all its proceedings, it is obvious that Mrs. Johnson was not present with the original 12 jurors yesterday during their deliberations. And this unusual circumstances requires me to give you an additional instruction.
>
> You will recall that I stressed when we concluded yesterday, how vital and critical it was to guarantee the integrity of trial by jury, that all 12 jurors, all 12 persons be fully present and participate in the process of jury deliberations. And you remember, I specifically said that you shouldn't discuss it with your roommate during the evening because the other 12 were entitled—the other 11 were entitled to your thoughts.
>
> This process involves a thorough review of all of the evidence and a complete and open exchange of views of each juror and every juror.
>
> Because Mrs. Johnson has not yet had the opportunity to review all of the evidence as you had yesterday, it is the responsibility of all of you to take reasonable measures to ensure that Mrs. Johnson has had a full opportunity to examine and review the evidence, as all have you [sic] had.
>
> Simply, it is necessary that she be given the opportunity to hear and consider the viewpoints each of you may have articulated thus far. In short, I instruct the original 11 members of the jury that you must take whatever time is necessary, even though it may be repetitious and time consuming, to completely update Mrs. Johnson as to the stage of deliberations you as a group have reached.
>
> I will not suggest any procedure or device to accomplish this court-ordered task, but will trust you to find and use your intelligence and judgment in doing so.
>
> Mrs. Johnson, I will now direct my remarks specifically to you. You find yourself [sic] somewhat of a disadvantage. Fortunately, however, with your diligence and the cooperation of your fellow jurors, you will be able to familiarize yourself with the deliberations concluded thus far, so that you are not at any disadvantage with regard to understanding all of the evidence and the views of your fellow jurors. It is essential and critical that you take whatever time is necessary to familiarize yourself with the evidence and the thinking and views of the jurors.
>
> You must guard against the natural feelings to rush or hasten in order to keep up with the majority or the other 11. I instruct you to be conscious, and forthright in telling the others if you feel any disadvantage with regard to the level of your understanding.
>
> When, and only when you feel yourself adequately and reasonably equipped to understand what has transpired thus far in the deliberations, should you signal to your fellow jurors your desire to move forward.
>
> Do any of you have any questions about the instructions I have just given you? I caution you and I remind you that whatever you reach, ladies and gentlemen, must be unanimous and I again request that you now begin deliberations for the day. Thank you.

10. The jury began separate deliberations following a penalty hearing. During those deliberations, the jury was unable to unanimously agree to recommend a sentence of death on the charges of Murder in the First Degree for either Claudio or Maymi.

11. Superior Court Criminal Rule 24(c) provides:

> **Alternate Jurors.** The Court may direct that not more than 4 jurors in addition to the regular jury be called and impanelled to sit as alternate jurors. *Alternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties.* Alternate jurors shall be drawn in the same manner, shall have the same qualifications, shall be subject to the same examination and

that Rule 24(c) only permits the replacement of regular jurors by alternates *"prior to"* deliberation. It is clear, as the State concedes, that the trial judge's action in replacing a regular juror with an alternate *during* deliberations was contrary to the strictures of Rule 24(c). The State maintains, however, that such error was harmless since it did not result in any demonstrable prejudice to the defendants.

Appellate courts which have considered the effect of violations of the federal counterpart of Rule 24(c) have reached differing results. An apparent majority have held that a trial court's violation of Rule 24(c) does not constitute reversible error where no prejudice to the defendant is established. *United States v. Hillard,* 701 F.2d 1052 (2nd Cir.1983), *cert. denied,* 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1318 (1983); *United States v. Kopituk,* 690 F.2d 1289 (11th Cir.1982), *cert. denied,* 461 U.S. 928, 103 S.Ct. 2089, 77 L.Ed.2d 300 (1983); *United States v. Phillips,* 664 F.2d 971 (5th Cir.1981), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982); and *Henderson v. Lane,* 613 F.2d 175 (7th Cir. 1980), *cert. denied,* 446 U.S. 986, 100 S.Ct. 2971, 64 L.Ed.2d 844 (1980).

Other courts have held that violations of the federal counterpart of Rule 24(c) result in prejudice which constitutes reversible error. *United States v. Lamb,* 529 F.2d 1153 (9th Cir.1975).[12] *See also, Bulls v. United States,* D.C.Supr., 490 A.2d 197 (1985) (sub-stitution of alternate for regular juror in violation of Criminal Rule 24(c) is reversible error unless government proves beyond a reasonable doubt that the defendant suffered no prejudice); and *People v. Barnes,* 58 A.D.2d 608, 395 N.Y.S.2d 232 (1977) (substitution of alternate for regular juror after deliberations had begun without defendant's consent resulted in prejudicial error).

We find that a proper examination of the defendants' Rule 24(c) argument is subsumed within a review of their constitutional claims. Claudio and Maymi contend that, apart from a literal violation of Superior Court Criminal Rule 24(c) [13], the substitution of an alternate juror after the beginning of deliberations, violated their rights to trial by jury as guaranteed by the federal and the Delaware Constitutions. We will examine their arguments based upon the Delaware and the United States Constitutions separately.

## UNITED STATES CONSTITUTION

### SUBSTITUTION OF ALTERNATE JUROR DURING DELIBERATIONS

The United States Supreme Court has never directly addressed whether the right to trial by jury, as it is guaranteed by the federal Constitution, would be violated by the substitution of an alternate juror during the deliberative process. However,

---

challenges, shall take the same oath and shall have the same functions, powers, facilities and privileges as the regular jurors. An alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict. . . .
(emphasis added).

**12.** In *Lamb,* the Ninth Circuit sitting *en banc* reversed a conviction because of the district court's failure to comply with Rule 24(c). The trial judge charged the jury, then dismissed the alternate instructing her to be prepared to return should she be needed. After four hours of deliberation the jury returned a verdict of guilty which the judge refused to accept because it was inconsistent with the instructions. One of the jurors then informed the judge that he would not be able to continue. The judge then recalled the alternate juror who was sent home when the jury retired to deliberate. The jury was reconstituted and instructed to begin their deliberations as if the case had just been submitted to them. Twenty-nine minutes later, the jury found the defendant guilty.

The *Lamb* court held that the substitution of the alternate constituted reversible error. It concluded that prejudice to the defendant resulted from the violation of Rule 24(c). *United States v. Lamb,* 529 F.2d at 1157. That court reasoned that reversal was warranted as a result of "impermissible coercion upon the alternate juror in this case . . . and that there was not the conscientious, careful reconsideration by the twelve of the newly constituted jury. . . ." *Id.* at 1156. The court was of the opinion that the jury's rendering of a verdict twenty-nine minutes after adjourning demonstrates coercion of the alternate.

**13.** Superior Court Criminal Rule 24(c) only permits the substitution of an alternate "prior to

# 1286

it did question the desirability and the constitutionality of such a procedure in 1942, when the Federal Rules Advisory Committee proposed to amend Criminal Rule 24 to permit the substitution of an alternate juror during deliberations. Orfield, *Trial Jurors in Federal Criminal Cases*, 29 F.R.D. 43, 46 (1962). In fact, the proposal to permit the substitution of an alternate juror during deliberations was abandoned by the Federal Rules Committee, after it was questioned by the United States Supreme Court. 29 F.R.D. at 50.

Subsequent proposals to permit the substitution of an alternate juror during deliberations have been consistently rejected by the Federal Rules Committee,[14] the ABA's Standards for Criminal Justice,[15] and some courts.[16] Notwithstanding these rejections and the United States Supreme Court's earlier expression of concern, several federal courts have held that the substitution of an alternate juror during deliberations is not violative of the right to trial by jury, which is secured by the Sixth Amendment to the federal Constitution. *See United States v. Hillard*, 701 F.2d 1052 (2nd Cir.1983), *cert. denied*, 461 U.S. 958, 103 S.Ct. 2431, 77

L.Ed.2d 1318 (1983); *United States v. Kopituk*, 690 F.2d 1289 (11th Cir.1982), *cert. denied*, 461 U.S. 928, 103 S.Ct. 2089, 77 L.Ed.2d 300 (1983); *United States v. Phillips*, 664 F.2d 971 (5th Cir.1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982); and *Henderson v. Lane*, 613 F.2d 175 (7th Cir.1980), *cert. denied*, 446 U.S. 986, 100 S.Ct. 2971, 64 L.Ed.2d 844 (1980). Those federal court rulings have upheld the constitutionality of the substitution of an alternate juror during deliberations through an application of the "essential feature" concept of the right to trial by jury, which is guaranteed by the United States Constitution, as that concept was formulated by the Supreme Court in *Williams v. Florida*, 399 U.S. 78, 100, 90 S.Ct. 1893, 1905, 26 L.Ed.2d 446 (1970).

In *Hillard*, after the jury had deliberated for two and one-half days, followed by a three-day holiday recess, the trial court substituted an alternate juror for a regular juror who became ill. *United States v. Hillard*, 701 F.2d at 1054–55. The trial court had separately sequestered the two alternates during the jury's deliberations, rather than discharging them as required

the time the jury retires to consider its verdict...."

**14.** In 1981, the Federal Rules Advisory Committee subsequently re-examined the problem caused when a juror must be excused during deliberations and again rejected the proposal to permit the substitution of an alternate juror during the deliberative process. *U.S. v. Gambino*, 788 F.2d 938, 948–49 (3d Cir.1986). The Committee's judgment is in accord with that of at least one prominent commentator.

There have been proposals that the rule should be amended to permit an alternate to be substituted if a regular juror becomes unable to perform his duties after the case has been submitted to the jury. An early draft of the original Criminal Rules had contained such a provision, but it was withdrawn when the Supreme Court itself indicated to the Advisory Committee on Criminal Rules doubts as to the desirability and constitutionality of such a procedure. These doubts are as forceful now as they were when they were first voiced. To permit substitution of an alternate after deliberations have begun would require either that the alternate participate though he has missed part of the jury discussion, or that he sit in with the jury in every case on the chance he might be needed. Either course is

subject to practical difficulty and to possible constitutional objection.

2 C. Wright, FEDERAL PRACTICE AND PROCEDURE § 388 (1982). *See also* 8A R. Cipes, I. Hall & M. Waxner, MOORE'S FEDERAL PRACTICE ¶ 24.06 (2d ed. 1990); and J. Ehrlinger, *Substitution of Alternate Jurors During Deliberations: Constitutional and Procedural Considerations*, 57 Notre Dame Lawyer 137 (1981).

**15.** 3 *ABA Standards for Criminal Justice* § 15–2.7, commentary (2d ed. 1980) ("it is not desirable to allow a juror who is unfamiliar with the prior deliberations to suddenly join the group and participate in the voting without the benefit of earlier group discussion").

**16.** *Bulls v. United States*, D.C.Supr., 490 A.2d 197 (1985); *United States v. Lamb*, 529 F.2d 1153 (9th Cir.1975), *cert. denied, Soteras v. United States*, 471 U.S. 1055, 105 S.Ct. 2117, 85 L.Ed.2d 481 (1985); and *People v. Ryan*, 19 N.Y.2d 100, 278 N.Y.S.2d 199, 224 N.E.2d 710 (1966). *Compare People v. Collins*, 17 Cal.3d 687, 131 Cal. Rptr. 782, 552 P.2d 742 (1976), *cert. denied*, 429 U.S. 1077, 97 S.Ct. 820, 50 L.Ed.2d 796 (1977); *Johnson v. State*, 267 Ind. 256, 369 N.E.2d 623 (1977), *cert. denied*, 436 U.S. 948, 98 S.Ct. 2855, 56 L.Ed.2d 791 (1978); *Tanner v. State*, 242 Ga. 437, 249 S.E.2d 238 (1978); *Commonwealth v. Haywood*, 377 Mass. 755, 388 N.E.2d 648 (1979);

by Federal Rule of Criminal Procedure 24(c). *Id.* at 1055. Although separated from the regular jurors, the alternates joined the jury whenever it returned to the courtroom to hear testimony or to receive additional instructions.[17] *Id.*

In *Hillard*, on appeal, it was contended that the substitution of the alternate juror violated the defendant's Sixth Amendment rights and the plain language of Federal Rule of Criminal Procedure 24(c). In addressing the federal constitutionality of the substitution procedure, the appellate court in *Hillard* considered the following facts: 1) the alternates were chosen with, and by the same procedures as, regular jurors; 2) the alternates heard all the evidence and instructions of law with the regular jurors; 3) the alternate chosen to replace the dismissed juror reaffirmed his ability to consider evidence and to deliberate fairly and fully, and indicated his discussion with the other alternate did not change his view of the case; 4) the trial judge instructed the newly constituted jury to begin deliberations anew; and 5) the jury deliberated for a considerable amount of time after the substitution and made considerable requests for exhibits, testimony and instruction. *Id.* at 1056–57.

The appellate court in *Hillard* then considered whether these factors had preserved the "essential feature" of the jury, defined by the United States Supreme Court as:

> the interposition between the accused and his accuser of the commonsense

judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence.

*Id.* at 1056 (quoting *Williams v. Florida,* 399 U.S. 78, 100, 90 S.Ct. 1893, 1906, 26 L.Ed.2d 446 (1970)). The court found that the facts before it suggested that the jury's "verdict was the product of the thought and mutual deliberation" of all twelve post-substitution jurors. *Id.* at 1057. Under the circumstances presented, it held that there was no violation of the United States Constitution. *Id.*

We have concluded that Claudio and Maymi's challenge to the substitution of an alternate juror during deliberations under the Sixth Amendment to the federal Constitution cannot prevail, albeit on alternative grounds, in the absence of any definitive decision by the United States Supreme Court. First, it fails, assuming arguendo, that the United States Supreme Court would concur with the interpretation of the United States Constitution by those federal courts which have concluded that the substitution of an alternate juror during deliberations is not violative of an "essential feature" of the right to trial by jury, as it is guaranteed by the Sixth Amendment.[18] *See United States v. Hillard,* 701 F.2d 1052 (2nd Cir.1983), *cert. denied,* 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1318 (1983); *United States v. Kopituk,* 690 F.2d 1289 (11th Cir.1982), *cert. denied,* 461 U.S. 928,

and *State v. Miller,* 76 N.J. 392, 388 A.2d 218 (1978).

17. In *Hillard,* before substitution, the trial judge interviewed the alternates. *United States v. Hillard,* 701 F.2d at 1055. They admitted that they had engaged in a general discussion of the case. *Id.* The first alternate acknowledged that he had formed a tentative opinion with respect to each defendant, but indicated that he could deliberate fully and fairly with the eleven regular jurors. *Id.* The trial judge, after discussion with counsel but over the defendant's objection, decided to proceed with the substitution. He instructed the reconstituted jury to begin their deliberations "from scratch." *Id.* The jury returned both guilty and non-guilty verdicts with respect to the various charges against the several defendants.

18. Prior to the adoption of the Fourteenth Amendment, the United States Supreme Court held that the federal Bill of Rights did not restrict state action. *Barron v. The Mayor and City Council of Baltimore,* 32 U.S. 243, 8 L.Ed. 672 (1833). After the Fourteenth Amendment was added to the United States Constitution, various provisions in the federal Bill of Rights have been made applicable to the states via the incorporation doctrine. *Palko v. State,* 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288 (1937), *rev'd on other grounds, Benton v. Maryland,* 395 U.S. 784, 794, 89 S.Ct. 2056, 2062, 23 L.Ed.2d 707 (1969). The United States Supreme Court held "that the Fourteenth Amendment guarantees a right of jury trial in all criminal cases which—were they to be tried in a federal court—would come within the Sixth Amendment guarantee." *Duncan v. State of Louisiana,* 391 U.S. 145, 88 S.Ct. 1444,

103 S.Ct. 2089, 77 L.Ed.2d 300 (1983); *United States v. Phillips*, 664 F.2d 971 (5th Cir.1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982); and *Henderson v. Lane*, 613 F.2d 175 (7th Cir. 1980), *cert. denied*, 446 U.S. 986, 100 S.Ct. 2971, 64 L.Ed.2d 844 (1980).

The alternative basis for this Court's rejection of Claudio and Maymi's federal Constitutional challenge requires a brief explanation. The United States Supreme Court has held that although the federal Constitution does not preserve the common law right to a jury of twelve persons [19] or the common law right to a unanimous jury verdict [20], it has preserved the inviolate nature of the jury's deliberative process at common law. In *Williams*, the *essential feature of a jury* is described as:

> the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and *shared responsibility* that results from *that group's* determination of guilt or innocence.

399 U.S. at 100, 90 S.Ct. at 1906 (emphasis added).

The paramount importance which the United States Supreme Court attributes to the deliberative process of the jury, as it existed at common law, is reinforced by that Court's subsequent action. In 1981, more than a decade after the decision in *Williams* concluded that the federal Constitution did not preserve *all* of the common law features of jury trials in criminal cases, the Federal Rules Committee presented the United States Supreme Court with two solutions to the problem caused by excusing a juror during the deliberative process. First, to amend Rule 23(b) to permit an eleven-juror verdict at the discretion of the trial judge, even in the absence of the defendant's consent. Second, to amend Rule 24(c) to permit the substitution of an alternate juror during deliberations, provided that the trial judge instructs the jury to begin its deliberations anew. *Amendments to Rules*, Advisory Committee Note on Rule 23(b), 97 F.R.D. 245, 262 (1983). The Committee expressed a strong preference for the first alternative. *Id.*[21] *United States v. Hillard*, 701 F.2d 1052, 1060 (2nd Cir.1983).

*Neither* of the *alternatives* presented by the Federal Rules Committee in 1981 would have been *permitted at common law*.[22] In the context of this case, it is significant that the United States Supreme Court followed the Committee's recommendation.[23] It approved the proposed amendment to Rule 23, which gave the trial judge discretion to accept a verdict by the remaining eleven jurors, even in the absence of the defendant's consent, in the event of post-submission discharge of a regular juror, *rather than* the proposal to permit the substitution of an alternate. 97 F.R.D. at 253.

---

20 L.Ed.2d 491 (1968), *reh'g denied*, 392 U.S. 947, 88 S.Ct. 2270, 20 L.Ed.2d 1412 (1968).

**19.** *Williams v. Florida*, 399 U.S. 78, 90 S.Ct. 1893, 20 L.Ed.2d 446 (1970) (criminal jury trials); and *Colgrove v. Battin*, 413 U.S. 149, 93 S.Ct. 2448, 37 L.Ed.2d 522 (1973) (civil jury trials).

**20.** *Apodaca v. Oregon*, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972). *Compare Andres v. United States*, 333 U.S. 740, 748–49, 68 S.Ct. 880, 884–85, 92 L.Ed. 1055 (1948).

**21.** The Committee voted 8–2 in favor of the first proposal. *See Rules of Criminal Procedure*, Advisory Committee Note on Rule 23(b), 91 F.R.D. 289, 338 (1981); and *Amendments to Rules*, Advisory Committee Note on Rule 23(b), 97 F.R.D. 245, 298–301 (1983). *See also* J. Grunat, *Post–Submission Substitution of Alternate Jurors In Federal Criminal Cases: Effects of Violations of*

*Federal Rules of Criminal Procedure 23(b) and 24(c)*, 55 Fordham L.Rev. 861, 868–881 (1987).

**22.** Prior to *Williams*, the Federal Rules of Criminal Procedure reflected the right to trial by jury as it existed at common law. D. Nicoli, *Federal Rules of Criminal Procedure 23(b) and 24(c): A Proposal to Reduce Mistrials Due To Incapacitated Jurors*, 31 Am.Univ.L.Rev. 651, 658 (1982). *See Patton v. United States*, 281 U.S. 276, 50 S.Ct. 253, 74 L.Ed. 854 (1930), which was distinguished in *Williams*.

**23.** In the Committee's view: "Even were it required that the jury 'review' with the new juror their prior deliberations or that the jury upon substitution start deliberations anew, it still seems likely that the continuing jurors would be influenced by the earlier deliberations and that the new juror would be somewhat intimidated by the others by virtue of being a newcomer to the deliberations." 91 F.R.D. at 341.

Thus, the *sine qua non* of the "essential feature" of right to a trial by jury in a criminal proceeding appears to be the common law inviolability of the jury's deliberative process. *Bulls v. United States*, 490 A.2d at 202.[24] If such a construction of the federal Constitution is correct, the United States Supreme Court will ultimately hold specifically that the substitution of an alternate juror during deliberations is in derogation of an "essential feature" of the right to trial by jury which the United States Constitution guarantees. Nevertheless, we are confident it would conclude that the violation of the federal Constitution in this case was harmless beyond a reasonable doubt, for the same reasons hereinafter stated with respect to the construction of the Delaware Constitution. *See Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); and *Bulls v. United States*, 490 A.2d at 202.

## DELAWARE CONSTITUTION

## SUBSTITUTION OF ALTERNATE JUROR DURING DELIBERATIONS

■ Claudio and Maymi also contend that the substitution of an alternate juror during the deliberative process violates their right to trial by jury, as it is guaranteed by the Delaware Constitution. The constitutions adopted by the original States and "the constitution of every State entering the Union thereafter, in one form or another," have protected the right to trial by jury in criminal cases. *Duncan v. State of Louisiana*, 391 U.S. 145, 153, 88 S.Ct. 1444, 1449, 20 L.Ed.2d 491 (1968). "The guarantees of jury trial in the Federal and State Constitutions reflect a *profound judgment* about the *way* in which law should be enforced and justice administered." *Id.* at 155, 88 S.Ct. at 1451 (emphasis added).[25]

The Delaware Constitution is not a mirror image of the United States Constitution. *Sanders v. State*, Del.Supr., 585 A.2d 117 (1990). The right to a trial by jury in the Delaware Constitution is not phrased identically to its corollary in the original federal Constitution or the federal Bill of Rights. Del. Const. art. I, §§ 4[26] & 7[27]; U.S. Const. art. III[28] and amend. 6[29]. A review of the history and origin of the right to trial by jury in the Delaware Con-

**24.** "Deliberation is today the essence of the jury".... J. Pope, *The Jury*, 39 Texas L.Rev. 426, 436 (1961).

**25.** A number of states, for example, authorize juries less than the common law number of twelve. *Maxwell v. Dow*, 176 U.S. 581, 20 S.Ct. 448, 44 L.Ed. 597 (1900). Several states do not adhere to the common law requirement for unanimous verdict. *Jordan v. Commonwealth*, 225 U.S. 167, 176, 32 S.Ct. 651, 652, 56 L.Ed. 1038 (1912); and *Fay v. NY*, 332 U.S. 261, 296, 67 S.Ct. 1613, 1631, 91 L.Ed. 2043 (1947). *See, e.g.*, Note, *Trial by Jury in Criminal Cases*, 69 Columbia L.Rev. 419, 430 (1969); and *Williams v. Florida*, 399 U.S. 78, 90 S.Ct. 1893, 20 L.Ed.2d 446 (1970).

**26.** Delaware Constitution, Article I, Section 4, states:

Trial by jury shall be as heretofore.

**27.** Delaware Constitution, Article I, Section 7 states:

In all criminal prosecutions, the accused hath a right to be heard by himself and his counsel, to be plainly and fully informed of the nature and cause of the accusation against him, to meet the witnesses in their examination face to face, to have compulsory process in due time, on application by himself, his friends or counsel, for obtaining witnesses in his favor, and a speedy and public trial by an impartial jury; he shall not be compelled to give evidence against himself, nor shall he be deprived of life, liberty or property, unless by the judgment of his peers or by the law of the land.

**28.** United States Constitution, Article III, states:

The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed.

**29.** United States Constitution, Sixth Amendment states:

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense.

stitution, vis-a-vis the history and origins of that right in the United States Constitution, reveals that the differences in phraseology between the Delaware and the federal right to trial by jury are not merely stylistic. There is, in fact, a significant substantive difference in that historic right, as it has been preserved for Delaware's citizens.

### Delaware History of Jury Trials

The right to trial by jury which is provided for in the Delaware Constitution has a long and distinguished historical origin. "Jury trial came·to America with English colonists and received strong support from them." *Duncan v. Louisiana,* 391 U.S. at 152, 88 S.Ct. at 1449. The legal heritage from England was followed in the Delaware courts.[30] *Nance v. Rees,* Del.Supr., 161 A.2d 795, 799 (1960). It is probable that a jury was empaneled in Delaware as early as 1669. 1 J. Scharf, *History of Delaware* 519 (1888). By 1675, trial by jury had become a fixed institution in Delaware. *Id.*

The American colonies resented royal interference with the right to trial by jury. *Duncan v. Louisiana,* 391 U.S. at 152, 88 S.Ct. at 1449.[31] On October 14, 1774, the First Continental Congress declared:

> That the respective colonies are entitled to the common law of England, and more especially to the great and inestimable privilege of being tried by their peers of the vicinage, according to the course of that law.

*Id.* (citation omitted). *See* 2 J. Kent, *Commentaries on American Law* 13 (13th ed. 1884). The Declaration of Independence stated solemn objections to the King's "depriving us in many cases, of the benefits of Trial by Jury. ...." *Duncan v. Louisiana,* 391 U.S. at 152, 88 S.Ct. at 1449. *See also* Vol. 1, *Del.C.* p. 13.

Following the signing of the Declaration of Independence on July 4, 1776, several states adopted their own constitutions, which included their own "bills of rights." J. Pope, *The Jury,* 39 Texas L.Rev. 426, 446 (1961). A convention met in Delaware at New Castle on August 27, 1776, to draft a Constitution for Delaware. 1 J. Scharf, *History of Delaware* 233. One of the delegates to that convention was Richard Bassett. 1 J. Scharf, *History of Delaware* 235. The importance of Richard Bassett's participation in framing Delaware's original Constitution, for the purpose of this case, will become apparent.

The Declaration of Rights and Fundamental Rules of the State of Delaware was adopted by the convention on September 11, 1776. Section 13 of that declaration provided:

> That trial by jury of facts where they arise is one of the greatest securities of the lives, liberties, and estates of the people.

Vol. 1, *Del.C.* 110. Shortly thereafter, the first Constitution of the State of Delaware was enacted on September 20, 1776. Article 25 of that first Delaware Constitution stated:

**30.** The English common-law form of trial by jury was transported to the American Colonies through the influence of the common-law writers such as Coke, Hale and Blackstone. *Gannett Co., Inc. v. DePasquale,* 443 U.S. 368, 424, 99 S.Ct. 2898, 2928, 61 L.Ed.2d 608 (1979) (Blackmun concurring in part and dissenting in part).

**31.** In 1723, an American jury acquitted John Peter Zenger from the royal charge of criminal libel. As tension grew between the American colonies and the King of England, it became apparent that it was the jury which was the ultimate protection of each citizen.

However powerful the crown, its coercive orders could not be enforced without a conviction by an independent American jury. Hence, the power and independence of the

jury had to be suppressed for oppression to prevail. When England enacted the Stamp Act in May of 1765, its enforcement was placed under the jurisdiction of the Admiralty Courts which meant the complete denial of a jury. In protest John Adams raised his voice:

'But the most grievous innovation of all, is the alarming extension of the power of courts of admiralty. In these courts, one judge presides alone! No juries have any concern there! ... We cannot help asserting, therefore, that this part of the act will make an essential change in the constitution of juries, and it is directly repugnant to the Great Charter itself....'

J. Pope, *The Jury,* 39 Texas L.Rev. 426, 445 (1961).

*The common law of England,* as well as so much of the statute law as have been heretofore adopted in practice in this state, *shall remain in force,* unless they shall be altered by a future law of the Legislature; such parts only excepted as are repugnant to the rights and privileges contained in this constitution and the declaration of rights, & c. agreed to by this convention. (emphasis added). Vol. 1, *Del.C.* 118. Thus, Delaware commenced its existence as an independent State with an unambiguous expression of its intention to perpetuate the right to trial by jury, as it had existed at common law, for its citizens.[32]

During the Revolutionary War, the states governed themselves with virtual autonomy. After securing their freedom from England, the states were reluctant to subject themselves to any other central government, particularly one with substantial powers. D. Smith, *The Convention and the Constitution* 3 (1965). Consequently, when the several independent states united following the American Revolutionary War, pursuant to the Articles of Confederation, each state's own sovereignty was made paramount to the national sovereignty. W. Powell, *A History of Delaware* 179 (1928). Moreover, since "the Articles of Confederation asserted no authority over individuals," it also afforded no individual protections. J. Pope, *The Jury,* 39 Tex.L.Rev. 426, 446 (1961). Therefore, Delaware's citizens continued to

be protected by the Declaration of Fundamental Rights and the Constitution which had been adopted by Delaware in 1776.

### Delaware and Debates on the Federal Right to Trial by Jury

The Articles of Confederation proved to be an unsuccessful form of government. Upon the recommendation of the Annapolis Convention,[33] Congress passed a resolution calling upon all of the states to send delegates to Philadelphia for the purpose of revising the Articles of Confederation. 1 J. Scharf, *History of Delaware* 268. Delegates from twelve states convened in Philadelphia. Although the delegates met to consider a revision of the Articles of Confederation, what emerged from the Philadelphia Convention was a plan for a new federation, based upon a strong central government, i.e., the United States Constitution.

John Dickinson and Richard Bassett were two of Delaware's delegates to that 1787 national convention in Philadelphia.[34] Both Dickinson and Bassett supported the concept of a strong federal government, as it was expressed in the final draft of the United States Constitution. Dickinson became one of the leading and most respected Federalist writers, endorsing ratification of the proposed Constitution in the *Letters of Fabius.* 1 J. Scharf, *History of Delaware* 206. With Bassett's leadership, Delaware became the first State to ratify the pro-

32. "English law, whether judge-made or statutory, became the law of the American Colonies when they declared their independence." *Manoukian v. Tomasian,* 237 F.2d 211 (D.C.Cir. 1956), *cert. denied,* 352 U.S. 1026, 77 S.Ct. 588, 1 L.Ed.2d 596 (1957), *quoted in Gannett Co., Inc. v. State,* Del.Supr., 571 A.2d 735, 756 n. 4 (1989), *cert. denied,* — U.S. —, 110 S.Ct. 1947, 109 L.Ed.2d 310 (1990).

33. In 1786, a convention of five states was convened in Annapolis to consider problems relating to interstate commerce. 1 J. Scharf, *History of Delaware* 268. Delaware was represented at the Annapolis Convention by John Dickinson, Richard Bassett and George Read. *Id.* John Dickinson was elected president of the Annapolis Convention. *Id.*

34. On February 3, 1787, the General Assembly of Delaware passed the following:

An act appointing Deputies from this State to a convention, proposed to be held in the City of Philadelphia, for the purpose of revising the Federal Constitution.

Whereas, the General Assembly of this State are fully convinced of the necessity of revising the Federal constitution, and adding thereto such further provisions as may render the same more adequate to the exigencies of the Union;....

SECTION 1. Be it therefore enacted by the General Assembly of Delaware, That George Read, Gunning Bedford, *John Dickinson, Richard Bassett* and Jacob Broom, Esquires, are hereby appointed Deputies from this State to meet in the Convention of Deputies of other States, to be held at the City of Philadelphia, on the second day of May next....

1 J. Scharf, *History of Delaware* 268 (emphasis added).

posed Constitution on December 7, 1787. *Id.* at 206, 269.

When the Constitution of the United States was being considered for ratification in other states, one of the overriding concerns expressed by many was the effect that the presence of a strong central government and the absence of a federal Bill of Rights would have on fundamental rights which had existed at common law, e.g., trial by jury.[35] Article III of the proposed federal Constitution provided that "[t]he Trial of all Crimes ... shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed." *Williams v. Florida,* 399 U.S. at 93, 90 S.Ct. at 1902. "The 'very scanty history of this provision in the records of the Constitutional Convention' sheds little light either way on the intended correlation between Article III's 'jury' and the features of the jury at common law." *Id.* However, in John Dickinson's view, the provision in Article III perpetuated the right to trial by jury as it had existed at common law.

In stating that view in 1788 and urging other states to follow Delaware's lead in ratifying the federal Constitution, John Dickinson described several aspects of the common law right to trial by jury in detail. Dickinson's understanding of Article III and the common law right to trial by jury is particularly instructive in this case.

It seems highly probable, that those who would reject this labour of public love [the proposed Constitution], would also

have rejected the Heaven-taught institution of trial by jury, had they been consulted upon its establishment. Would they not have cried out, that there never was framed so detestable, so paltry, and so tyrannical a device for extinguishing freedom, and throwing unbounded domination into the hands of the king and barons, under a contemptible pretence of preserving it? "What! ... Why then is it insisted on; but because the fabricators of it know that it will, and intend that it shall reduce the people to slavery? Away with it—Freemen will never be enthralled by so insolent, so execrable, so pitiful a contrivance."

Happily for us our ancestors thought otherwise. They were not so over-nice and curious, as to refuse blessing, because, they might possible be abused....

Trial by Jury is our birth-right; and tempted to his own ruin, by some seducing spirit, must be the man, who in opposition to the genius of United American, shall dare to attempt its subversion....

*In the proposed confederation, it is preserved inviolable in criminal cases, and cannot be altered in other respects, but when United American demands it.*

J. Dickinson, *Letters of Fabius, 1788,* letter IV, *quoted in* 1 B. Schwartz, *The Bill of Rights: A Documentary History* 546–550 (1971) (emphasis added).

Despite the assurances from John Dic-

---

**35.** The movement to add a Bill of Rights to the federal Constitution began during the debates in September, 1787 in Philadelphia. During those debates, George Mason, an Anti–Federalist (the popular name for those opposing the Constitution) wrote his *Objections to the Constitution. See* P.L. Ford, *Pamphlets on the Constitution of the United States* 327–32 (1888), *reprinted in* 1 B. Schwartz, *The Bill of Rights: A Documentary History* 444–47 (1971). Mason started his *Objections* by the assertion: "There is no declaration of rights," and "the declaration of rights, in the separate states, are no security" since federal laws are supreme. *Id.* at 327, *reprinted in* 1 B. Schwartz, *The Bill of Rights: A Documentary History* 444. *Mason v. State,* Del.Supr., 534 A.2d 242 at 246 n. 8 (1987). In response to Mason's concern, another delegate to the Philadelphia convention, Roger Sherman, argued that a fed-

eral Bill of Rights was unnecessary because "the State Declarations of Rights are not repealed by this Constitution ... and being in force are sufficient." THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 588 (M. Farrand ed. 1911), *quoted in* Note, *The Interpretation of State Constitutional Rights,* 95 Harv.L.Rev. 1324, 1327 (1982).

The assurances by James Madison and Roger Sherman that the guarantees provided in the state Declaration of Rights would continue was never in serious dispute. Nevertheless, following the ratification of the Constitution, the momentum for a federal Bill of Rights continued. The purpose of the Bill of Rights was to restrain the strong central government which was provided for in the Constitution, just as the various state Declaration of Rights restrained the individual state governments. *Id.*

kinson and other Federalist writers,[36] fears had continued to be expressed that Article III's provision failed to preserve *all of the common-law rights* to trial by jury, e.g., the right to be tried by a "jury of the vicinage." *Williams v. Florida*, 399 U.S. at 93, 90 S.Ct. at 1902. That concern, as well as the desire "to preserve the right to jury in civil as well as criminal cases, furnished part of the impetus for introducing amendments to the Constitution that ultimately resulted in the jury trial provisions of the Sixth and Seventh Amendments." *Id.* at 94, 90 S.Ct. at 1902.[37]

When President George Washington gave his first annual message to Congress in 1789, he noted that demands for amendments to the United States Constitution were widespread. 1 *Annals of Congress,* 27–30 (Washington, D.C. 1834), *reprinted in* 2 B. Schwartz, *The Bill of Rights: A Documentary History* 1009–12 (1971).[38] On June 8, 1789, not long after President Washington's first annual message to Congress, James Madison addressed the House of Representatives. The proposed amendments to the United States Constitution, which were described by Madison in that address, covered all of the provisions which eventually became the federal Bill of Rights. 1 *The Debate and Proceedings of the Congress of the United States* 449–53 (Washington, D.C. 1834), *quoted in Mason v. State*, 534 A.2d at 246–47 n. 8.

The amendment relating to jury trial in criminal cases, as introduced by James Madison in the House, would have provided that: " 'The trial of all crimes ... shall be by an impartial jury of freeholders of the vicinage, with the requisite of unanimity for conviction, of the right of challenge, and other accustomed requisites....' " *Williams v. Florida*, 399 U.S. at 94, 90 S.Ct. at 1902–03 (citing 1 Annals of Cong. 435 (1789)). That Amendment passed the House in substantially the same form in which it was submitted. *Id.* For the purpose of this case, it is important to note the common law form in which the right to trial by jury originally passed in the United States House of Representatives, since John Vining[39] of Delaware was the Chairman of the House Committee Select which had studied Madison's proposals.[40] *See* 2

36. Alexander Hamilton wrote that a federal Bill of Rights was unnecessary because there was no need to "declare that things shall not be done which there is no power to do?" *The Federalist* No. 84 (A. Hamilton). *See also The Federalist* No. 83 (A. Hamilton). James Madison argued that the United States Constitution recognized and preserved the independent significance of each state's Declarations of Rights in the division of powers and functions between the federation comprised of state and national governments. *The Federalist* No. 52, at 357–59 (J. Madison) (J. Cooke ed. 1961).

37. Massachusetts was the first State to officially propose amendments which it sent to Congress along with its ratification of the United States Constitution. Other states followed the Massachusetts approach. *Mason v. State*, 534 A.2d at 246 n. 8. For Hamilton's response to these proposals with respect to the right to trial by jury, *see The Federalist* No. 83 (A. Hamilton).

38. In 1788, George Washington had written to the Marquis de Lafayette that the provisions in Article III for jury trials reflected the difficulty in establishing a mode for trial by jury that would not interfere with "the fixed modes of any of the States, [and had] ... induced the convention to leave it as a matter of future adjustment." 11 *The Writings of George Washington* 254–59, *quoted in* 2 B. Schwartz, *The Bill of Rights: A Documentary History* 986–88.

However, by the next year, it became apparent to then President Washington that the "future adjustments" with respect to the certain fundamental rights, including the right to trial by jury, could not be postponed.

39. Delaware's first United States Representative, John Vining, was the son of Chief Justice Vining. Congressman Vining studied law with George Read and was admitted to the Delaware Bar in 1783. 1 J. Scharf, *History of Delaware* 569.

40. On July 21, Madison made a motion that the House go into a Committee of the Whole, to consider the amendments to the federal Constitution which he had proposed on June 8. The House instead voted to send Madison's proposals, as well as the amendments proposed by the various states, to a select committee, for study.

The select committee did its job rapidly and, a week later, on July 28, John Vining of Delaware, who acted as Chairman, "made a report which was ordered to lie on the table".... It is fair to say that the Committee version made no substantial alteration in the original Madison draft. The Committee did, however, make certain stylistic changes which brought the amendments closer to the final Bill of Rights version.
2 B. Schwartz, *The Bill of Rights: A Documentary History* 1050.

B. Schwartz, *The Bill of Rights: A Documentary History* 1050.

After more than a week of debate in the Senate, Madison's proposed amendment with regard to trial by jury was returned to the House in a considerably altered form.[41] *Williams v. Florida*, 399 U.S. at 94, 90 S.Ct. at 1902. "The version that finally emerged from the Committee was the version that ultimately became the Sixth Amendment, ensuring an accused: 'the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law....'" *Williams v. Florida*, 399 U.S. at 96, 90 S.Ct. at 1903. The provisions spelling out such *common-law features* of the jury as "unanimity," or "the accustomed requisites" *were gone. Id.* The "vicinage" requirement had been replaced by wording that reflected a compromise between broad and narrow definitions of that term. *Id.* Thus, it was left to Congress to determine the actual size of the "vicinage" through the establishment of judicial districts. *Id.* Significantly, one of Delaware's first two United States Senators during the time of this debate was Richard Bassett. Senator Bassett voted in favor of the common law right to trial by jury,[42] as originally proposed by Madison and recommended by the House Committee Select, chaired by John Vining.

The United States Supreme Court has concluded that three significant features may be observed in the history of the enactment of the United States Constitution's jury trial provisions. *Williams v. Florida*, 399 U.S. at 96, 90 S.Ct. at 1903. "First, even though the vicinage requirement was as much a feature of the common-law jury as was the twelve-man requirement, the mere reference to 'trial by jury' in Article III was not interpreted to include that feature."[43] *Id.* "Second, provisions that would have explicitly tied the 'jury' concept to the 'accustomed requisites' of the time were eliminated."[44] *Id.* at 96–7, 90 S.Ct. at

41. Apparently, the records of the actual debates that occurred in the Senate are not available. However, a letter from Madison to Edmund Pendleton on September 14, 1789, indicates that:

one of the Senate's major objections was to the "vicinage" requirement in the House version. A conference committee was appointed. As reported in a second letter by Madison on September 23, 1789, the Senate remained opposed to the vicinage requirement, partly because in its view the then-pending judiciary bill—which was debated at the same time as the Amendments—adequately preserved the common-law vicinage feature, making it unnecessary to freeze that requirement into the Constitution. "The Senate," wrote Madison: "are ... inflexible in opposing a definition of the *locality* of Juries. The vicinage they contend is either too vague or too strict a term; too vague if depending on limits to be fixed by the pleasure of the law, too strict if limited to the county. It was proposed to insert after the word Juries, *'with the accustomed requisites,'* leaving the definition to be construed according to the judgment of professional men. *Even this could not be obtained....*

The Senate suppose, also, that the provision for vicinage in the Judiciary bill will sufficiently quiet the fears which called for an amendment on this point."

*Williams v. Florida*, 399 U.S. at 95–6, 90 S.Ct. at 1903 (emphasis added).

42. A motion was then made [in the United States Senate] to reconsider article the tenth, and to restore the words following: "The trial of all crimes (except in cases of impeachment, and in cases arising in the land or naval forces, or in the militia when in actual service, in time of war or public danger,) shall be by an impartial jury of the vicinage, with the requisite of unanimity for conviction, the right of challenge, and other accustomed requisites." On this question, the yeas and nays being required, it was decided as follows:

Yeas—Messrs. *Bassett,* Dalton, Grayson, Gunn, Henry, Lee, Paterson, Schuyler.—8. (emphasis added).

Nays—Messrs. Carroll, Ellsworth, Johnson, Izard, King, Morris, Read, Wingate.—8.

The numbers being equal, the question was lost.

2 B. Schwartz, *The Bill of Rights: A Documentary History* 1154.

43. The debates over the Amendments reflect that the disagreement about whether the vicinage requirement should be included at all in its common-law sense resulted in the compromise language. *Williams v. Florida*, 399 U.S. at 96, 90 S.Ct. at 1903.

44. One explanation for this action is that the "accustomed requisites" were thought to be already included in the concept of a "jury."

But that explanation is no more plausible than the contrary one: that the deletion had some substantive effect. Indeed, given the clear expectation that a substantive change

1904. "Finally, contemporary legislative and constitutional provisions indicate that where Congress wanted to leave no doubt that it was incorporating existing common-law features of the jury system, it knew how to use express language to that effect."[45] *Id.* at 97, 90 S.Ct. at 1904. Consequently, the United States Supreme Court has concluded that it is not "able to divine precisely what the word 'jury' imported to the Framers, the First Congress, or the States in 1789. . . . *But there is absolutely no indication in 'the intent of the Framers' of an explicit decision to equate the [United States] constitutional and common-law characteristics of the jury." Id.* at 98-9, 90 S.Ct. at 1904–05 (emphasis added).

The debates about Madison's proposed amendments to the United States Constitution ended in 1791 with the adoption of the federal Bill of Rights.[46] When the debates about the federal Bill of Rights were over, John Dickinson's interpretation of the phrase "trial by jury" in Article III, as preserving the common law right to trial by jury, had been proven incorrect. *Id.* at 96, 90 S.Ct. at 1903. Moreover, despite the original urging of James Madison, the subsequent endorsement of that recommendation by the House Committee Select, chaired by Delaware's Congressman John Vining and the support of Senators, such as Delaware's Richard Bassett, the effort to preserve *all* of the common law rights to

trial by jury in the federal Bill of Rights had not prevailed. Congress had made an express decision not to preserve all of the features of the common law right to trial by jury, when it could have done so in the Sixth and Seventh Amendments to the United States Constitution. *Id.* at 96–9, 90 S.Ct. at 1903–05.

### *Delaware Constitution's Common Law Commitment*

On September 8, 1791, the Delaware General Assembly called for a state constitutional convention. 1 J. Scharf, *History of Delaware* 270. The Delaware Constitutional Convention "assembled at Dover, on Tuesday, November 29, 1791, and elected John Dickinson, president." *Id.* Delaware's United States Senator, Richard Bassett, who had been a delegate to the state constitutional convention in 1776 was also a delegate to the Delaware Constitutional Convention in 1791.[47] *Id.*

John Dickinson's involvement in the debates about the right to trial by jury in Article III, during the ratification process of the United States Constitution in 1788, as well as Congressman John Vining's and Senator Richard Bassett's involvement with the debates on that subject, preceding the enactment of the federal Bill of Rights in 1791, provide important historical insight into what happened in 1791, when Delaware decided to amend its own Constitu-

---

would be effected by the inclusion or deletion of an explicit "vicinage" requirement, the latter explanation is, if anything, the more plausible.
*Williams v. Florida,* 399 U.S. at 97, 90 S.Ct. at 1904.

**45.** The Judiciary bill was signed by the President on the same day that the House and Senate finally agreed on the form of the Amendments to be submitted to the States. It:

provided in certain cases for the narrower "vicinage" requirements that the House had wanted to include in the Amendments. And the Seventh Amendment, providing for jury trial in civil cases, explicitly added that "no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law."
*Williams v. Florida,* 399 U.S. at 97, 90 S.Ct. at 1904.

**46.** President Washington officially transmitted the proposed amendments to the states for ratification on October 2, 1789. The state ratifications began with Maryland in early 1790. The Bill of Rights became a part of the United States Constitution on December 15, 1791, with Virginia's ratification. Secretary of State Jefferson sent the official notice to the Governors of the several states on March 1, 1792. It announced that three-fourths of the state legislatures had ratified the first ten amendments. 2 B. Schwartz, *The Bill of Rights: A Documentary History* 1171–72.

**47.** Richard Bassett subsequently served as Delaware's Governor from 1798 to 1801 and thereafter as an eminent jurist. 1 J. Scharf, *History of Delaware* 206.

tion. After the debates about the meaning of the term "trial by jury" in Article III and the provisions on that subject to be included in the federal Bill of Rights were finished, Delawareans, especially John Dickinson and Richard Bassett, were acutely aware of the need to set forth an intention to perpetuate fundamental rights, as they had existed at common law, in unambiguous language.

When the amendments to the United States Constitution, which had been proposed by Madison, were being discussed by the House of Representatives Committee Select, John Vining had urged "a plainness and simplicity of style on this and *every other occasion,* which should be easily understood." 2 B. Schwartz, *The Bill of Rights: A Documentary History* 1068 [48] (emphasis added). John Vining's advice was followed by Dickinson, Bassett, and the other delegates to the 1791 Delaware Constitutional Convention. When the convention concluded its work on December 31, 1791, its draft of the proposed Delaware Constitution provided that "trial by jury shall be as heretofore," [49] i.e., the provision in the 1776 Delaware Constitution perpetuating the guarantee of trial by jury as it existed at common law. *Nance v. Rees,* 161 A.2d at 799. *See also* Vol. 1, *Del.C.* 121; and 1 J. Scharf, *History of Delaware* 270.

Thus, Delaware's unambiguous commitment to the preservation of the common law right to trial by jury was evidenced with a "simplicity of style." The draft was signed by the members of the Delaware Constitutional Convention on January 12, 1792. W. Powell, *A History of Delaware* 191. The signatures of the long-time champions of the common law right to trial by jury, John Dickinson and Richard Bassett, signify their satisfaction and approval of the provision that "trial by jury shall be as heretofore" in the December 31, 1791 draft. Vol 1, *Del.C.* 137. That draft was adopted, without change, as Delaware's Constitution later in 1792. 1 J. Scharf, *History of Delaware* 270–71.

Delaware's constitutional commitment to continue to guarantee the right to trial by jury for its citizens, as it existed at common law, was expressly recognized in the arguments presented in the earliest reported decision to construe the phrase "trial by jury shall be as heretofore" in the Delaware Constitution of 1792:

[t]he [Delaware] Constitution is express that "trial by jury shall be as heretofore," plainly intending to secure both the form and the substance, the trial and the constitution of the jury.

[t]he framers of the [Delaware] Constitution of 1776 were aware of that importance, when they declared (1 Del.Laws, Appendix 81) it to be a fundamental rule "that trial by jury of facts where they arise is one of the greatest securities of the lives, liberties and estates of the people." *The provision in the present Constitution is stronger and more positive,* "Trials by jury shall be as heretofore."

A comparison of the [Delaware] Constitution or System of Government and Declaration of Rights of 1776 with the present Constitution will convince any one, if a doubt exists on the subject, that *the Convention of 1792 had the old Constitution before them and made it in fact the groundwork of their labors;*

---

**48.** Delaware established a Constitution Revision Commission in 1967. 56 Del.Laws, ch. 189. It is interesting to note that Vining's historical advice was followed again when that Commission agreed to use language which was "plain and simple."

**49.** The Pennsylvania Ratifying Convention approved the United States Constitution on December 15, 1787 by a vote of 42 to 23. The Pennsylvania minority submitted fifteen amendments as a condition of their approval, including one amendment which provided that "trial by jury shall be as heretofore." Hamilton's opposition to that particular suggestion is found in

*The Federalist* No. 83 (A. Hamilton). The Pennsylvania recommendation did not prevail in the debates preceding the ratification of the United States Constitution or the federal Bill of Rights. However, in 1790, Pennsylvania amended its own *state constitution* to provide that "trial by jury shall be as heretofore, and the right thereof remain inviolate." Pa. Const. Art. I § 6. John Dickinson's ties to Pennsylvania are well known, e.g., Dickinson represented Pennsylvania in the Continental Congress in 1776. Dickinson was also elected to be the Governor of Pennsylvania in 1782.

for many of its most important provisions are inserted in the present Constitution without the slightest variation even of the expressions, while other principles of the old system are adopted in language differing but little in its terms, and bearing precisely the same purport. The fourteenth section of the Declaration of Rights is made the seventh section of first article of the present [Delaware] Constitution, with this important exception, that it is not provided in the latter, as in the former, that no person shall be found guilty without the unanimous consent of an impartial jury. But are we therefore to suppose that it was intended to vest the legislature with the power of enacting that a person accused of a criminal offense might be convicted upon the finding of a majority of a jury? By no means. It was considered that this principle was secured by the fourth section, which says that *"trial by jury shall be as heretofore,"* and a *repetition of it was deemed unnecessary.*

*Wilson v. Oldfield,* Clayton 169, 1 Delaware Cases 622, 624–27 (1818) (emphasis added).

The teaching of *Oldfield* was ratified and reaffirmed by this Court one hundred and fifty years later:

It is of course fundamental under our law that the verdict of a jury must be unanimous. This follows from Article I, § 4 of the Delaware Constitution, Del.C. Ann. providing that, 'The right to trial by jury shall be as heretofore.' This provision of our Constitution guarantees the right to trial by jury as it existed at common law.... Unanimity of the jurors is therefore required to reach a verdict since such was the common law rule.

*Fountain v. State,* Del.Supr., 275 A.2d 251 (1971).

One year earlier, in 1970, the Delaware Constitution Revision Commission had written in its study commentary:

Article I, Section 4, of the present constitution deals with three distinct subjects: (1) Right of trial by jury in civil cases; (2) right of trial by jury in criminal cases; and (3) requirement, composition, and conduct of the grand jury. Since the three types of juries, including special juries, existed at *common law, the 1792 Constitution's adoption of the right of trial by jury "as heretofore," and its carryover in successive constitutions to date, brings forward to the present day reliance on the common law as to right of the petit jury in civil and criminal actions,* the special jury in civil actions, and the grand jury. *Because of this situation, reference must always be made to common law to properly interpret the meaning of the present constitution.*

*Documents of the Constitution Revision Commission,* Commentary on the Proposed Constitution, Proposed Section 1.02 (1969) (emphasis added).

Article I, Section 4 of the Delaware Constitution still provides that "[t]rial by jury shall be as heretofore." This language has appeared in Article I, Section 4 of three successive Delaware constitutions—1792, 1831 and 1897. This language was left unchanged when Article I, Section 4 was amended as recently as 1984. This Court and the other courts of Delaware have always construed that provision in the Delaware Constitution as *"guaranteeing the right to trial by jury as it existed at common law." Fountain v. State,* Del. Supr., 275 A.2d 251 (1971) (emphasis added). *See also In re Markel,* Del.Supr., 254 A.2d 236 (1969); *Nance v. Rees,* Del.Supr., 161 A.2d 795 (1960); and *Thomas v. State,* Del.Supr., 331 A.2d 147 (1975).[50] *See, e.g., State v. Fossett,* Del.Super., 134 A.2d 272 (1957)[51]; and *Hopkins v. Justice of Peace*

---

**50.** This Court held since criminal contempt was not tried by a jury at common law, it "does not fall within the provision of Article 1, § 4 of the Delaware Constitution which guarantees a right to trial by jury as 'heretofore.'" *Thomas v. State,* Del.Supr., 331 A.2d 147 (1975).

**51.** In *Fossett* then Judge, later Chief Justice, Herrmann, wrote: "Under the Delaware Constitution, the defendant is guaranteed the right of trial by jury 'as heretofore'. Art. I, § 4 *Del.C.* Ann. By virtue of this guaranty, the common law right of jury trial of the factual issue in this proceeding must be preserved to the defendant." *State v. Fossett,* 134 A.2d at 276.

*Court No. 1,* Del.Super., 342 A.2d 243 (1975).

In *Williams v. Florida,* when examining the federal Constitutional right to a jury trial, the United States Supreme Court stated:

> While "the intent of the Framers" is often an elusive quarry, the relevant constitutional history casts considerable doubt on the easy assumption in our past decisions that if a given feature existed in a jury at common law in 1789, then it was necessarily preserved in the Constitution.

*Williams v. Florida,* 399 U.S. at 92–3, 90 S.Ct. at 1902. After an extensive review of the history leading to the actual wording of the right to trial by jury in the federal Bill of Rights, the United States Supreme Court concluded:

> [T]here is absolutely no indication in "the intent of the Framers" of an explicit decision to equate the constitutional and common-law characteristics of the jury.

*Id.* at 99, 90 S.Ct. at 1905. Accordingly, the United States Supreme Court has turned to other than purely historical considerations to determine *which features* of the jury system, as it existed at common law, were preserved in the United States Constitution. *Id.*

Conversely, it is untenable to conclude that the right to trial by jury in the Delaware Constitution means exactly the same thing as that right in the United States Constitution. *Sanders v. State,* Del.Supr., 585 A.2d 117 (1990). The history of the right to trial by jury "as heretofore," which has remained unchanged in the Delaware Constitution since 1792, demonstrates an unambiguous intention to equate Delaware's constitutional right to trial by jury

with the common law characteristics of that right.[52] Consequently, *all* of the fundamental features of the jury system, as they existed at common law, have been preserved for Delaware's citizens. Therefore, the proper focus of any analysis of the right to trial by jury, as it is guaranteed in the Delaware Constitution, requires an examination of the common law.

### Delaware Constitution and Common Law Substitution of Alternate Jurors Prior to Deliberations

At common law, when a member of a jury became ill or died during the trial, the jury was discharged. *See* 3W. Blackstone, COMMENTARIES *351–67. The other eleven members of the jury were then recalled along with another juror to complete the twelve. *See* Annotation, *Alternate or Additional Jurors,* 84 A.L.R.2d 1288, 1290 (1962). The parties were given their full complement of challenges and afforded the opportunity to use them against the reconstituted panel. *Id.* Once a new jury was selected and sworn the trial began anew. *Id. See also ABA Standards For Criminal Justice* § 15–2.7, commentary. This was obviously a costly and time consuming process.

This Court and others have recognized the validity of implementing procedures which improve the operation of the jury system, as it existed at common law, *without* changing the fundamental common law features of right to trial by jury. *Ruffin v. State,* Del.Supr., 123 A.2d 461 (1956). For example, in an effort to save scarce judicial resources, statutes and court rules have been enacted which permit the selection of alternate jurors at the beginning of the trial when the regular jurors are selected.[53]

---

**52.** The Supreme Courts of other states have reached similar conclusions. *See, e.g., In re Advisory Opinion to Senate,* R.I.Supr., 278 A.2d 852, 855–57 (1971); *Baker v. City of Fairbanks,* Alaska Supr., 471 P.2d 386, 399–401 (1970); and *State v. Sklar,* Me.Supr., 317 A.2d 160, 166–68 (1974).

**53.** These statutes and rules are of two types. Most common is the alternate-juror or substituted-juror type, whereby one or more persons specifically identified as alternates are chosen in advance of trial. If a regular juror is discharged before the jury retires (or, in a few jurisdictions, before verdict), an alternate juror is then designated as a replacement. The second type provides for additional jurors, sometimes referred to as the eliminated-juror system. Under such a statute or rule, thirteen to sixteen jurors are selected in advance of trial. If a juror must be discharged during the trial, this is done without any further action at that time. If more than twelve jurors remain at the time the jury is to retire,

*Id.* at 466. Delaware adopted a rule analogous to that used in the federal system.[54] Superior Court Criminal Rule 24(c) permits the selection of up to four alternates along with the regular jury, to "replace jurors who, *prior to the time the jury retires to consider its verdict*, become or are found to be unable or disqualified to perform their duties." Super.Ct.Crim.R. 24(c) (emphasis added).

The present procedure in the Superior Court, which provides for the simultaneous selection of regular and alternate jurors and allows alternate jurors to be substituted *prior* to the commencement of the jury's deliberations, is the functional equivalent of the common law system. The jurors and the alternates are assiduously instructed not to discuss the case until it has been submitted to them for deliberation.

It is now my duty to instruct you as to your conduct during the trial. I must give you certain admonitions, certain warnings, that will remain with you throughout this entire trial.

The first one is that you are not to discuss this case among yourselves while the evidence is being presented to you. The first time you will be allowed to discuss this case among yourselves is after you have heard all of the evidence, the arguments of counsel, the instructions of the Court, and have retired to the jury room. Then, and then only,

should you begin to discuss and deliberate this case.

The reason for the rule that you are not to discuss this case while the evidence is being presented to you is that you might commit yourself one way or the other before you have had an opportunity to hear all of the evidence, instructions, and discussion of the other jury members. Therefore, the Court asks you not to discuss the case until you have heard all of the evidence, the Court's final instructions, and the arguments of counsel.

*Delaware Pattern Jury Instructions*, Jurors' Conduct During Trial–Admonition, 1B.[55] When the jury retires to deliberate, the alternates must be excused.[56] Super. Ct.Crim.R. 24.

The present practice preserves the common law system of submitting the case to twelve persons, who deliberate for the first time, only after all of the evidence has been presented. As one court has stated:

There is no question that the provision for the substitution of alternate jurors prior to the submission of the case to the jury is constitutional. During the course of the trial the 12 regular jurors and the alternate jurors are treated similarly in all respects. And since the jurors are not permitted to discuss the case among themselves until it is submitted to them, there is no way in which the defendants' rights could be prejudiced if 1 or more of

the twelve who are to determine the case are selected by lot. *ABA Standards For Criminal Justice* § 15–2.7, commentary at 15.72.

The *ABA Standards for Criminal Justice*, § 15–2.7 regards either of the two alternatives as an effective means "for dealing with the problem of delay because of the loss of a juror *prior* to the commencement of deliberations." *Id.* Delaware follows the former approach. Super.Ct.Crim.R. 24.

**54.** Congress enacted a statute in 1932 which provided for the use of alternate jurors in federal courts for the first time. D. Nicoli, *Federal Rules of Criminal Procedure 23(b) and 24(c): A Proposal To Reduce Mistrials Due To Incapacitated Jurors*, 31 Am.Univ.L.Rev. 651, 654–55 (1982). When Federal Rule of Criminal Procedure 24(c) was adopted in 1946, it was consistent with the federal statutory practice. *Id.*

**55.** The Superior Court's *Handbook for Petit Jurors* also instructs them, in part, as follows:

It is important for all members of the jury panel to remember that they must not discuss any case at any time with any person, either before or after the case, unless authorized to do so by the Court. Likewise, during the trial, the case must not be discussed with any person except a fellow juror—and then only after all of the evidence has been introduced and the case given to the jury for deliberation.

. . . . .

Jurors should keep an open mind. They should not discuss the case before the testimony is complete and the case is submitted by the Judge.

*A Handbook for Petit Jurors* 5, 19.

**56.** The only exception to this mandatory requirement is in capital cases, such as the case *sub judice.* 11 Del.C. § 4209(b).

the 12 jurors are replaced by an alternate juror. Twelve jurors who hear the evidence and are in all respects treated as jurors participate in the deliberations and render a verdict.

*People v. Ryan,* 278 N.Y.S.2d at 201–02, 224 N.E.2d at 712–13; and *Robinson v. United States,* 144 F.2d 392, 397–98 (6th Cir.1944), *cert. denied,* 323 U.S. 789, 65 S.Ct. 311, 89 L.Ed. 629 (1944), *cert. granted on reh'g,* 323 U.S. 808, 65 S.Ct. 552, 89 L.Ed. 644 (1945), *aff'd on other grounds,* 324 U.S. 282, 65 S.Ct. 666, 89 L.Ed. 944 (1945). In fact, the present procedure, pursuant to Superior Court Criminal Rule 24, which provides for the use of alternate jurors and their substitution *prior* to the commencement of the jury's deliberations has been upheld under the Delaware Constitution by this Court. *Ruffin v. State,* Del.Supr., 123 A.2d 461 (1956).[57]

### *Delaware Constitution and Common Law Substitution of Alternate Juror During Deliberations*

Although the substitution of an alternate juror prior to the commencement of the jury's deliberations is the functional equivalent of the practice at common law, the substitution of an alternate juror during the jury's deliberations is the antithesis of the practice at common law. At common law, the commencement of the jury's deliberative process marked a unique and inviolate stage of the trial proceeding. As one commentator notes:

In 1354, we find among the Parliament Rolls a striking petition, ... "that here-

after when any people are at issue and the inquest is charged and sworn, all evidence which is to be said (*totes evidences que sont a dire*) be openly said at the bar, so that after the inquest departs with its charge, no justice or other person have conference (*parlance*) with them to move or procure the said inquest, but that they say the fact upon their own peril and oath." This petition was granted.

J. Thayer, *The Jury and Its Development,* 5 Harv.L.Rev. 295, 318 (1892). *See also* J. Pope, *The Jury,* 39 Texas L.Rev. 426, 440 (1961).

In the 18th century, Blackstone wrote:

Our law has therefore wisely placed this strong and two-fold barrier, of a presentment and a trial by jury, between the liberties of the people, and the prerogative of the crown.... [T]he founders of the English law have with excellent forecast contrived, that ... the truth of every accusation, whether preferred in the shape of indictment, information, or appeal, should afterwards be confirmed by the *unanimous* suffrage of *twelve* of his equals and neighbours, indifferently chosen and superior to all suspicion.

4 W. Blackstone, COMMENTARIES *349– 50 (emphasis added). *See also Duncan v. Louisiana,* 391 U.S. at 151–52, 88 S.Ct. at 1449. Blackstone described the jury's deliberative process as follows:

The jury, after the proofs are summed up, unless the case be very clear, *withdraw from the bar to consider of their*

---

**57.** In *Ruffin,* this Court carefully limited its holding to the constitutionality of the alternate's presence *before* the jurors began deliberating.

In our opinion there has been *no violation of any constitutional right* of appellant. While it is true that the alternate jurors were kept with the regular jurors during the trial, they were not present when the evidence was concluded and the jury retired for its deliberations.... We think that under the provisions of Rule 24(c), the alternate jurors should likewise have been kept together. The fact that prior to the retirement of the jury for deliberation the alternate jurors were kept with the regular jurors under the supervision of the bailiffs of the Superior Court is not important unless there is a showing of some improper act as a result thereof. There is no contention

here that the alternate jurors were guilty of any improper actions.

Appellant has cited two cases: *People v. Bruneman,* 4 Cal.App.2d 75, 40 P.2d 891, and *People v. Britton,* Cal.App., 45 P.2d 368. These cases are of no help to appellant, since the act complained of in each was the presence of the alternate jurors in the jury room with the regular jury during its deliberations.

We do not think that *any* constitutional right of appellant has been violated or that she has been prejudiced in any manner by the mingling of the alternate jurors with the regular jury during the trial and *prior to the deliberations of the regular jury.*

*Ruffin v. State,* 123 A.2d at 466–67 (emphasis added).

*verdict:* and, in order to avoid intemperance and causeless delay, are to be kept without meat, drink, fire, or candle, unless by the permission of the judge, *till they are all unanimously agreed.*

3 W. Blackstone, COMMENTARIES *375 (emphasis added).[58] Thus, at common law, once it retired to consider its verdict, "the jury" was irrevocably constituted. The deliberative process was required to continue inviolate by those twelve persons "until *they* are all unanimously agreed." *Id.* (emphasis added).

*All* of the fundamental features of the right to trial by jury, as they existed at common law, have been preserved by the Delaware Constitution.[59] This Court has expressly held that under the Delaware Constitution, unanimity of the jurors is required to reach a verdict since such was the common law rule.[60] *Fountain v. State,* Del.Supr., 275 A.2d 251 (1971). It has also been expressly recognized that the Delaware Constitution guarantees the common law right to a trial by a jury of twelve persons[61] in a criminal proceeding. *Hopkins v. Justice of the Peace Court No. 1,* Del.Super., 342 A.2d 243 (1975). Similarly, the right to trial by jury at common law

required a unanimous verdict by the *same* twelve jurors who retired to deliberate. Thus, that common law characteristic of the right to trial by jury in a criminal proceeding is guaranteed by the Delaware Constitution.

At common law, the rule was "[i]f a juror becomes unable to serve after the jury retires to deliberate, a mistrial *must* be declared if one or both parties refuse to stipulate to a verdict delivered by a jury of less than twelve members." D. Nicoli, *Federal Rules of Criminal Procedure 23(b) and 24(c): A Proposal To Reduce Mistrials Due To Incapacitated Jurors,* 31 Am.Univ.L.Rev. 651, 652 (1982) (emphasis added). In this case, the substitution of an alternate juror during the deliberative process was in derogation of the common law. Consequently, it was contrary to defendants' right to trial by jury "as heretofore," which has been guaranteed by the Delaware Constitution since 1792.[62]

## Delaware Constitutional Harmless Error Analysis Substitution of Alternate Juror During Deliberations

■ Having concluded that the substitution of the alternate juror during the deli-

58. In the words of the Third Circuit "the day has long passed when jurors were sent to deliberate upon their verdict and were 'kept without meat, drink, fire or candle' until they reached a verdict." *U.S. v. Piancone,* 506 F.2d 748, 749 (3d Cir.1974). Delaware has adopted various rules and procedures which recognized the trial judge's discretionary right at common law to permit the jurors to eat and even to separate during the course of their deliberations. Super. Ct.Crim.R. 24(f). However, Delaware has been assiduous in promulgating rules and statutes which preserve the inviolability and the irrevocability of the jury's deliberative process at common law, once the twelve jurors have retired in an effort to reach a unanimous decision. The bailiff takes an oath not to allow any one to speak to the jury once they begin deliberating. *Hughes v. State,* Del.Supr., 437 A.2d 559, 577 (1981). If the jurors are sequestered overnight during the deliberative process, they are carefully instructed not to discuss the case, even with each other, except when the *entire* jury is assembled for that purpose *as a group.* If the jury is not sequestered during the deliberative process, it is carefully instructed before it separates and carefully questioned after it returns before it is permitted to resume its deliberations. *See, e.g., Smith v. State,* Del.Supr., 317 A.2d 20, 23 (1974).

59. The Delaware General Assembly has specifically recognized that any change in the common law right to trial by jury in a criminal proceeding would require an amendment of the Delaware Constitution. 58 Del.Laws, ch. 471, §§ 1.02 and 1.03.

60. In 1376, it became settled at common law that the jury's verdict must be unanimous. J. Pope, *The Jury,* 39 Texas L.Rev. 426, 436 (1961) (citing J. Thayer, *The Jury and Its Development,* 5 Harv.L.Rev. 295, 297 (1892); and 1 Holdsworth 318.

61. It is said that during the reign of Henry II (1154–1189 A.D.), the foundations of the English Common Law were laid. J. Pope, *The Jury,* 39 Texas L.Rev. 426, 431–32 (1961). For example, during the reign of Henry II, it was settled, at common law, that a jury should be composed of *twelve* persons. *Id.* (emphasis added).

62. *Accord People v. Ryan,* 278 N.Y.S.2d at 202, 224 N.E.2d at 713 ("the Constitution of this State, as it has been construed, prohibits the substitution of an alternate juror—in effect a 13th juror—after the jury has begun its deliberation.").

berative process was contrary to the common law right to a jury trial which is guaranteed by the Delaware Constitution, the effect of that error must be examined. Professor Wright argues that such substitutions are reversible error *per se.*[63] *See also United States v. Lamb,* 529 F.2d 1153 (9th Cir.1975). However, this Court has consistently refused to *automatically* reverse convictions for violations of the Delaware Constitution. *Van Arsdall v. State,* Del.Supr., 524 A.2d 3, 10 (1987) (emphasis added) (citations omitted). Accordingly, the departure from the requirement of the Delaware Constitution which occurred in this case will be subjected to a harmless error analysis. *Id. See also Bulls v. United States,* 490 A.2d at 202. A reversal of Claudio and Maymi's convictions is mandated only if this court " 'cannot say that the error was harmless beyond a reasonable doubt.' " *Van Arsdall v. State,* 524 A.2d at 11 (quoting *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967)).

In this case, the proper focus of a harmless error analysis must be upon the danger of prejudice to Claudio and Maymi by the substitution of the alternate juror *during* the jury's deliberations. This Court has recognized the difficulty, at times, which a defendant has in *proving actual prejudice within a jury panel. Massey v. State,* Del.Supr., 541 A.2d 1254, 1257–58 (1988) (emphasis added). That difficulty is attributable to the sanctity of the jury's deliberations and the common law prohibition against jurors impeaching their own verdict.[64] However, this Court and others have also recognized "that a flat prohibition against receiving post-verdict testimony from jurors would contravene another important public policy: that of 'redressing

the injury of the private litigant where a verdict was reached by a jury that was not impartial.' " *Sheeran v. State,* 526 A.2d at 895 (citing *Patterson v. Colorado,* 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879 (1907)).

The need to accommodate the conflicting policies of preserving the sanctity of a jury's deliberations and the defendant's right to be convicted only by an impartial jury, has resulted in the recognition of a distinction between extrinsic and intrinsic influences upon a jury's verdict. *Id.* "Since the 19th Century, the established rule regarding a juror's competence to attack a verdict is that 'a juryman may testify to any facts bearing upon the question of the existence of any extraneous influence, although not as to how far that influence operated upon his mind.' " *Id.* (citing *Mattox v. U.S.,* 146 U.S. 140, 149, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1892)). *See Hughes v. State,* Del.Supr., 490 A.2d 1034 (1985). The common law prohibition against inquiry into the jurors' mental processes is adhered to in Delaware. *See Massey v. State,* 541 A.2d at 1257; and *Burke v. State,* Del.Supr., 484 A.2d 490, 500 (1984). It has been codified in Delaware Rule of Evidence 606:

> COMPETENCY OF JUROR AS WITNESS. *Inquiry into Validity of Verdict or Indictment.* Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on

**63.** According to Wright, "it is reversible error, even though defendant may have consented ... to substitute an alternate after deliberations have begun." 2 C. Wright, FEDERAL PRACTICE AND PROCEDURE § 388 at 52–53 (1969). *Compare* R. Cipes, I. Hall & M. Waxner, MOORE'S FEDERAL PRACTICE ¶ 24.–06 (2d ed. 1990).

**64.** "As a general rule, a juror may not impeach his own verdict once the jury has been dis-

charged." *Sheeran v. State,* Del.Supr., 526 A.2d 886, 894 (1987) (citing *McDonald v. Pless,* 238 U.S. 264, 267, 35 S.Ct. 783, 784, 59 L.Ed. 1300 (1915)). "This rule promotes several public policies: 1) discouraging harassment of jurors by losing parties eager to have the verdict set aside; 2) encouraging free and open discussion among jurors; 3) reducing incentives for jury tampering; 4) promoting verdict finality; and 5) maintaining the viability of the jury as a judicial decision-making body." *Id.*

the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes. Rule 606(b).

In an effort to adequately address the evidentiary limitation caused by precluding any inquiry into a juror's mental processes, this Court has adopted an inherently prejudicial egregious circumstances test. *Massey v. State*, 541 A.2d at 1258–59. This Court has held that if a defendant can prove a reasonable probability of juror taint due to egregious circumstances that are inherently prejudicial, it will give rise to a presumption of prejudice and the defendant will not have to prove actual prejudice. *Id.* at 1259. "We have determined that the inherently prejudicial egregious circumstances test which raises a presumption of prejudice adequately takes care of the problem under D.R.E. 606(b) of preclud-

ing any inquiry into a juror's mental processes." *Id.*

Given the prohibition against any inquiry into the jurors' mental processes,[65] we must decide if this is a case of egregious circumstances so inherently prejudicial as to constitute actual prejudice or to raise a presumption of prejudice in favor of Claudio and Maymi. In this case, the alternates were separately sequestered after the jury began its deliberations, pursuant to 11 *Del.C.* § 4209(b). The alternate jurors did not discuss the case with each other while they were sequestered. The alternate jurors returned to the courtroom when the regular jurors requested to view Claudio's face. When the trial judge inquired as to whether the jurors could begin their deliberations anew they responded affirmatively. The trial judge fully and carefully instructed the reconstituted jury to deliberate anew.[66] Most importantly, the time which elapsed between the commencement of the "renewed" deliberations and the rendition of a verdict is *objective* circumstantial evidence that the trial judge's instructions[67] were followed and vitiate any con-

---

65. Any inquiry into a juror's mental processes would have been a separate and equally fundamental violation of the Delaware Constitution's guarantee of a trial by jury as it existed at common law. Ever since *Bushell's Case*, the jury's independence from official reprisal has been maintained and courts have been precluded from inquiring into the jury's deliberative process. Note, *Public Disclosure of Jury Deliberations*, 96 Harv.L.Rev. 886, 891 n. 31 (1983) (quoting *Bushell's Case*, 124 Eng.Rep. 1006 (K.B. 1670)). "Holdsworth wrote that, ... prying into the jury's verdicts would have been as 'impious' as questioning the judgments of God." 1 W. Holdsworth, *A History of English Law* 317 (7th ed. 1956), *quoted in* Note, *Public Disclosures of Jury Deliberations*, 96 Harv.L.Rev. at 893 n. 43. At common law jurors were prohibited from impeaching their verdict. The common law no-impeachment rule was discussed by Lord Mansfield in *Vaise v. Deloval*, 99 Eng.Rep. 944 (K.B. 1785). *See McDonald v. Pless*, 238 U.S. 264, 267–69, 35 S.Ct. 783, 784–85, 59 L.Ed. 1300 (1915). The common law prohibition against post trial inquiry into the jury's deliberative process, as a fundamental feature of the right to trial by jury, is recognized in Delaware. *See, e.g., Massey v. State*, 541 A.2d at 1257; *Sheeran v. State*, 526 A.2d at 894–97; *Burke v. State*, 484 A.2d at 500; D.R.E. 606(b); and Del.R.Prof.Responsibility 3.10(d). The secrecy of the deliberative process is central to the right to trial by

jury. Note, *Public Disclosure of Jury Deliberations*, 96 Harv.L.Rev. at 897 (1983). Consequently, any judicial inquiry into whether the jury had followed the instruction to deliberate anew would have been a separate violation of the guarantees in the Delaware Constitution of the right to trial by jury as it existed at common law.

66. Those instructions were prepared with the assistance of the attorneys for the State, as well as the attorneys for Claudio and Maymi. *See* footnote 9.

67. The problem with the substitution of an alternate juror after the deliberations have begun has been described by one Court as follows:

[a]ny time there is substitution of a juror after jury deliberations have begun, the same twelve jurors have not participated in the entire deliberative process. Two essential features of the right to trial by jury ... are that the jury be composed of twelve persons and that the jury reach a unanimous verdict. Twelve people must have the opportunity to review the evidence in light of each juror's perception, memory and reaction and to reach their consensus through deliberations which are the common experience of all of them. Each of the twelve must have the opportunity to persuade the other members of

cern of juror coercion. *Compare United States v. Lamb*, 529 F.2d 1153 (9th Cir. 1975);[68] and *Bulls v. United States*, D.C. Supr., 490 A.2d 197 (1985).

We find that this is not a case of egregious circumstances so inherently prejudicial as to demonstrate actual prejudice or to raise a presumption of prejudice in the defendants' favor. *Massey v. State*, Del. Supr., 541 A.2d 1254 (1988). *But see McCloskey v. State*, Del.Supr., 457 A.2d 332 (1983). Thus, under the circumstances of this case, we are satisfied that the substitution of the alternate juror during deliberations, albeit in violation of the Delaware Constitutional guarantee of the right to trial by jury "as heretofore" at common law, was harmless beyond a reasonable doubt. *Compare Bulls v. United States*, 490 A.2d at 202; and *State v. Lehman*, 108 Wis.2d 291, 321 N.W.2d 212, 225 (1982). However, having reached that conclusion, we hasten to add that we do not condone

that practice as a matter of course or convenience.

The discharge of a juror, after deliberations have begun, is an infrequent event. *State v. Lehman*, 321 N.W.2d at 220. However, such occurrences were neither unknown at common law nor without a solution. At common law, with the *consent* of the parties, the unanimous verdict of eleven jurors could be accepted by the court.[69] That common law characteristic of the right to trial by jury is expressly provided for in Superior Court Criminal Rule 23(b).[70]

Superior Court Criminal Rule 24(c) recognizes that the substitution of an alternate juror during deliberations is prohibited by the Delaware Constitution and expressly provides for the discharge of alternate jurors before the jury's deliberations begin.[71] Except for the requirements of 11 *Del.C.* § 4209(b) in capital cases, the alternates in this case would have been discharged.[72]

the jury and to be persuaded by them.... If, during deliberations, a juror is discharged and another substituted, the eleven regular jurors will have had the benefit of the views of the discharged juror while the alternate will not. The eleven regular jurors will have formed views without the benefit of the views of the alternate juror, and the alternate juror who is unfamiliar with the prior deliberations will participate without the benefit of the prior group discussion. If deliberations have progressed to the point where the eleven regular jurors are in substantial agreement, the alternate juror may find it difficult to persuade and convince the eleven who have already come to an understanding.
*State v. Lehman*, 108 Wis.2d 291, 321 N.W.2d 212, 220 (1982).

**68.** The majority in *Lamb* stated that the length of the jury's "renewed" deliberations was "not a factor" in its decision. *United States v. Lamb*, 529 F.2d at 1156. However, it was obviously concerned that the original twelve jurors deliberated four hours before a juror was excused and only twenty-nine minutes after the alternate was substituted. *Id.* at 1156 n. 7. *But see United States v. Kopituk*, 690 F.2d 1289 (11th Cir. 1982) (jury deliberated for one week after substitution of alternate). *See* footnote 7.

**69.** According to Thayer, by 1369, the requirement of twelve in the petit jury, *unless by consent*, and the need of unanimity, seemed to have become the settled rule at common law. J. Thayer, *The Jury and Its Development*, 5 Harv.L. Rev. 295, 297 (1892). Delaware Superior Court Criminal Rule 23(b) is consistent with the com-

mon law. It permits a verdict of less than twelve *by consent.*

**70.** Superior Court Criminal Rule 23(b) provides:
**Jury of Less Than 12.** Juries shall be of 12 but at any time before verdict the parties may stipulate in writing with the approval of the Court that the jury shall consist of any number less than 12.

**71.** Superior Court Criminal Rule 24(c) provides, in part, that "[a]n alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict...."

**72.** The State suggests that section 4209(b) effectively amends Superior Court Rule 24(c) to permit retention of alternate jurors after the regular panel has begun deliberations. While the statute may have that effect, it does not purport to authorize substitution during deliberations. The alternates are specifically retained for the potential penalty hearing *not* for substitution during the deliberative process of the guilt/innocence phase of the trial. "Alternate jurors shall not be excused from the case prior to submission of the issue of guilt to the trial jury and shall remain separately sequestered until a verdict on guilt is entered. If the verdict of the trial jury is guilty of first-degree murder said alternates shall sit as alternate jurors on the issue of punishment." 11 *Del.C.* § 4209(b).
The statute clearly contemplates that the makeup of the jury might change between the guilt phase and the punishment phase of a capital murder trial if substitution were to occur

Thus, when a juror must be excused after deliberations have commenced, in the absence of the parties' consent to accept the unanimous verdict of eleven jurors, the declaration of a mistrial has been the norm in Delaware for more than two hundred years, pursuant to the common law and the Delaware Constitution.

The constitutions of every State guarantee the right to trial by jury in criminal cases in one form or another. *Duncan v. Louisiana*, 391 U.S. at 153, 88 S.Ct. at 1449. The form of trial by jury chosen by each State reflects a profound statement of how it will administer justice. *Id.* In 1776, Delaware chose to guarantee its citizens the right to trial by jury in the same form as it existed at common law. In 1792, John Dickinson, Richard Bassett, and the other framers of Delaware's Constitution, preserved that right as "heretofore." Delaware's commitment to preserving *all* of the fundamental features of the common law right to trial by jury has remained constant in every Delaware Constitution since 1792.

The substitution of the alternate juror during the deliberations in this case was more expeditious than the declaration of a mistrial. Blackstone warned against permitting inroads into the common law right to trial by jury for the sake of judicial economy.

> So that the liberties of England cannot but subsist, so long as this *palladium* remains sacred and inviolate, not only from all open attacks, (which none will be so hardy as to make) but also from all secret machinations, which may sap and undermine it; by introducing new and arbitrary methods of trial, ... And however *convenient* these may appear at first, (as doubtless all arbitrary powers, well executed, are the most *convenient*) yet let it be again remembered, that delays, and little inconveniences in the forms of justice, are the price that all free nations must pay for their liberty in more substantial matters; that these inroads upon this sacred bulwark of the nation are fundamentally opposite to the spirit of our constitution; and that, though begun in trifles, the precedent may gradually increase and spread, to the utter disuse of juries in questions of the most momentous concern.

4 W. Blackstone, COMMENTARIES * 350.

The problem caused by that substitution may have been avoided through a stipulation of the parties, pursuant to Superior Court Criminal Rule 23(b), that they would accept the unanimous verdict of eleven jurors.[73] As a matter of future practice, the trial judge should pursue that option rather than proceeding in violation of the Delaware Constitution. *Patton v. United States*, 281 U.S. 276, 50 S.Ct. 253, 74 L.Ed. 854 (1930).[74]

after a guilty verdict but before deliberations commenced in the punishment phase. To that extent, the statute recognizes that the jury's role in sentencing is separate and distinct from its role in determining guilt or innocence. The propriety of that distinction has been recognized by this Court. *Sanders v. State,* Del.Supr., 585 A.2d 117 (1990); and *Whalen v. State,* Del. Supr., 492 A.2d 552, 557 (1985). *See also Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

**73.** The trial judge did not ask the parties if they were willing to stipulate to a unanimous verdict by the eleven remaining jurors. The record reflects that when the juror became ill the court made the following statement, in part, to counsel:

> THE COURT: [Name of juror] Juror No. 7 is ill and he was the one that was ill last week. He was complaining of difficulties. He is sitting in the front row. The older woman would be substituted [name of alternate]. I propose that we excuse him. He's sick. Sub-

stitute [the alternate's name]. Now, the next question is what do we tell them. Start all over again? I am sure it wouldn't take them long....

**74.** In *Patton,* the following question was certified:

> After the commencement of a trial in a federal court before a jury of twelve men upon an indictment charging a crime, punishment for which may involve a penitentiary sentence, if one juror becomes incapacitated and unable to further proceed with his work as a juror, can defendant or defendants and the government through its official representative in charge of the case consent to the trial proceeding to a finality with 11 jurors, and can defendant or defendants thus waive the right to a trial and verdict by a constitutional jury of 12 men?

The questioned was answered in the affirmative. *Patton v. United States,* 281 U.S. 276, 287, 50 S.Ct. 253, 254, 74 L.Ed. 854 (1930).

## CONCLUSION

The judgments of the Superior Court, which resulted in the convictions of Claudio and Maymi, are AFFIRMED.